[Civ. No. 13886. Third Dist. Aug. 17, 1976.]

COUNTY OF INYO, Petitioner, v.
CITY OF LOS ANGELES et al., Respondents.

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

L. H. "Buck" Gibbons, District Attorney, and Antonio Rossman for Petitioner.

Fredric P. Sutherland, Ralph Winter and Richard E. Gutting, Jr., as Amici Curiae on behalf of Petitioner.

Burt Pines, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, and Edward A. Schlotman, Deputy City Attorney, for Respondents.

**OPINION**

**FRIEDMAN, Acting P. J.**—We have before us the appeal of the County of Inyo from the second interim pumping rate order directed to the City of Los Angeles by the Sacramento Superior Court.

This litigation focuses primarily on the obligation of the City of Los Angeles to comply with the California Environmental Quality Act ("CEQA") as a prerequisite to increasing its extraction of subsurface water from the Owens Valley Basin. By our decision of June 5, 1973 (*sub nom. County of Inyo v. Yorty*, 32 Cal.App.3d 795 [108 Cal.Rptr. 377]), we held that the proposed increase of extraction was a "project" within the

purview of CEQA. In the exercise of our original jurisdiction to issue prerogative writs (Cal. Const., art. VI, § 10), we ordered issuance of a peremptory writ of mandate directing the City of Los Angeles to prepare an environmental impact report ("EIR") and to complete proceedings required by CEQA.

Secondarily, the litigation requires the establishment of an interim rate of groundwater extraction pending the lawsuit's ultimate resolution. Because the computation of an interim extraction rate required an evidentiary inquiry, we referred the matter to the Sacramento Superior Court for the purpose of taking evidence and establishing a rate measured by an averaging formula described in our decision.

In that decision we adopted the thesis that the city's need for groundwater would vary inversely to the amount of natural precipitation; that it would face augmented need for groundwater in a dry year, diminished need in a wet year. (County of Inyo v. Yorty, supra, 32 Cal.App.3d at pp. 815-816.) We envisioned an interim pumping allowance based upon average extractions prevailing during the wettest and driest years during the period from July 1, 1970, by which time the second Los Angeles aqueduct was in operation, and the date of our decision, June 5, 1973. This span lent itself to division into three 12-month spans, each beginning on July 1.

The superior court took evidence and on October 12, 1973, fixed a pumping rate averaging 221.4 cubic feet per second ("cfs") per 12-month cycle commencing each July 1. The county then appealed. We set aside the order of October 12, 1973, conceding that the formula we had evolved for the superior court's guidance had been "factually inaccurate and inapplicable to the case at hand." We described what we believed to be a more appropriate formula and returned the matter to the superior court for further proceedings. (County of Inyo v. Yorty, 3 Civ. 14441, unpublished opinion dated Sept. 4, 1974.)

By orders dated May 12, 1975, and May 13, 1975, the superior court then fixed an interim pumping rate not to exceed an average of 178.5 cfs per 12-month cycle commencing each July 1. Once more Inyo County appeals, protesting that the superior court's order is overly generous, damaging to the environment and out of compliance with the averaging formula directed by this court. Again we confess to inadequate communication between the superior court and ourselves. In our September 4, 1974, decision, we recognized that the availability of groundwater could

not be segregated into neat, twelve-month periods; that an average withdrawal over the entire three-year period would form a starting point, but only a starting point. We intended the superior court to place equitable considerations on the scale; that court viewed our opinion as a directive for flat mathematical averaging based upon a three-year history of pumping. Therefore we now vacate the superior court's interim orders of May 12 and May 13, 1975.

In the meantime the City of Los Angeles responded to this court's peremptory writ of mandate by filing an EIR dated May 1976. We are informed that on July 15, 1976, the city's board of water and power commissioners certified completion of the EIR and approved the project of increased groundwater pumping from the Owens Valley Basin. The county has indicated objections to the legal sufficiency of the EIR.

This lawsuit represents a dispute of major importance, socially, economically and environmentally. It poses competition between two legitimate and weighty public needs—preservation of the environmental quality of the Owens Valley against the burgeoning water requirements of California's largest population center. The public interest requires early resolution of the dispute. Having accepted original jurisdiction, we shall forego further references to the superior court. Following oral argument on July 21, 1976, we issued an order directing the City of Los Angeles to file a return to the peremptory writ of mandate and fixing time limits for objections by the county and a replication by the city. We have continuing jurisdiction to enforce the peremptory writ of mandate. (Code Civ. Proc., § 1097; see *Gonzales* v. *Internat. Assn. of Machinists* (1963) 213 Cal.App.2d 817, 820 [29 Cal.Rptr. 190].) The writ directing an EIR will not be satisfied until there has been a final judicial determination of the EIR's validity.[1] That determination will be made initially by this court whether it involves questions of law or fact or both.

There remains the necessity of establishing an interim pumping rate to hold sway pending resolution of the primary issue. The proceedings before the superior court have resulted in the accumulation of an

---

[1] We made a parallel observation in *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at page 816, by stating that an interim pumping rate would be imposed "until the filing of an EIR and appropriate action thereon as provided by law."

See also, *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 702-704 [104 Cal.Rptr. 197, supp. op. 28 Cal.App.3d 512, 104 Cal.Rptr. 714].

evidentiary record which now permits us to establish an interim rate of groundwater extraction without further reference to that court.

In the establishment of a groundwater pumping rate, dual problems emerge: first, the formulation of an equitably conceived base for future maxima; second, the delineation of a time span to which these maxima shall be applied.

Inyo County now asks us to restrict the city's extraction rate to an average of 89 cfs, which represents the withdrawal rate on November 23, 1970, the effective date of CEQA. The City of Los Angeles asks for affirmance of the 178.5 cfs rate fixed by the superior court, that figure representing an average rate computed over the three-year period.

Neither rate is appropriate, for neither takes account of equitable factors. ■ Mandate proceedings, although not of equitable origin, are governed by equitable principles. (*San Diego County Dept. of Public Welfare* v. *Superior Court* (1972) 7 Cal.3d 1, 9 [101 Cal.Rptr. 541, 496 P.2d 453].) Equity molds its decree by the configurations of substantial justice as perceived by the chancellor. (*Bechtel* v. *Wier* (1907) 152 Cal. 443, 446 [93 P. 75].) The 89 cfs rate prevailing on November 23, 1970, represents a happenstance. The fact that CEQA became effective on that date has no actual relationship to the ecological welfare of the Owens Valley or to the city's good faith need for water. The city is not extracting water owned by others; it seeks to utilize water rights belonging to it as overlying or appropriative owner. We reject the 89 cfs limitation sought by Inyo County.

In contrast, the 178.5 cfs rate fixed by the superior court represents a mathematical average divorced from equitable considerations. It recognizes neither the city's need nor the county's disadvantage. At this point several pieces of evidence assume importance. The three-year, 1970-1973, period represents a succession of dry years and a relatively high rate of groundwater pumping. According to the county's evidence, inclusion of a relatively wet year would have reduced the average pumping rate to 119.4 cfs. As noted in our June 1973 opinion (32 Cal.App.3d at pp. 800-801), the city's ultimate plans for the utilization of Owens Valley water envisioned a long-term average groundwater utilization rate of 147 cfs.[2] The superior court's permission for an interim

---

[2] The 147 cfs figure was projected in a groundwater management report issued in 1972. In its final environmental impact report dated May 1976, the department of water and power fixed its projected long-term pumping rate at 140 rather than 147 cfs.

rate averaging 178.5 cfs represents a level of extraction substantially higher than the city's long-range proposal. The latter is premised upon years of "normal" precipitation. Not in evidence but within the scope of judicial notice is the unusual lack of rain and snowfall during the winter of 1975-1976. During the present period of extraordinary strain upon diminishing surface and subsurface water supplies, the 178.5 cfs rate permits a short-term withdrawal greatly exceeding the city's estimate of its own long-range need.

■ An interim short-term pumping level in the neighborhood of the 147 cfs long-range rate projected by the city is supported by Inyo County's evidence of an "available precipitation pumping year." The latter concept is based on the precipitation of a given year and also the April estimate of snow pack and runoff. April 1970 to April 1971 is the period of highest available precipitation (13.39 inches). During this period of time the city pumped a 9-month average of 60.31 cfs. The period of low available precipitation was April 1972 to April 1973 (7.88 inches), during which the city pumped 238.81 cfs. The average between these figures is 149.56 cfs. The latter figure represents a basis for future maxima.

In the selection of a base period of "average" pumping, the three-year, 1970-1973, period selected by the court has much to commend it. The second Los Angeles Aqueduct had been placed in operation or partial operation in 1970. The three-year period provides a perspective on pumping needs. The city's pumping rate during that period was unaffected by court order. Inferably, it was governed by correlative factors of water collection ability, system capacity (including the second aqueduct) and actual need. The 149.56 cfs rate, drawn from an average of high and low levels of precipitation, rests upon a basis of actual experience and actual need.

The city denigrates its long-term pumping rate as a yardstick for a short-term order, especially during the current year of drought when groundwater supplies must be utilized at the maximum. It points out that its 140 cfs long-term average is calculated to permit up to 315 cfs of underground pumping in a single year. The answer to this contention is that neither party can have what it wants or needs; rather, that the needs of both must be recognized and balanced.

We assume for the present that subsurface withdrawals averaging 149.56 cfs over a long period would lower the water table in the Owens

Valley and cause marked environmental changes. In our June 1973 opinion (32 Cal.App.3d at pp. 801-802) we described the county's prophecies of environmental damage. The limitation under consideration is relatively short-term. It is reasonable to expect that the primary issue (i.e., the city's compliance with CEQA) will be resolved within the near future. There is no evidence that a short-term pumping rate of 149.56 cfs rate will cause environmental damage. If the litigation necessitates extended interim pumping limitations, the courts will be available for modifications justified by future conditions.

Quantitatively, then, a 149.56 cfs interim limit appears appropriate. ■ We turn to the time component involved in fixing average rate of use. The evidence demonstrates that the wet-versus-dry-year concept is not an acceptable criterion of groundwater management. The extraction rate should be influenced by the quantities of snowfall and rainfall preceding and not concurrent with the period of use. Over a span of years, 80 percent of the annual precipitation occurs during the six-month period commencing October 1 of each year. The Los Angeles Department of Water and Power keys its hydrological management to measurements of precipitation and snowpack beginning each October 1. Six months later, by April 1, measurements permit estimates of comparative surface runoff and groundwater replenishment, supplying a key to rates of use for the ensuing twelve-month period. A 12-month use cycle commencing each January 1 or July 1 is a synthetic and unrealistic imposition upon nature's cycle. A rational extension of nature's six-month supply cycle commencing October 1 is a twelve-month use cycle commencing April 1.

Superimposed upon nature's supply cycle are a group of man-made factors: surface reservoir storage, system capacities and increased summer demands for export water and for fulfillment of the city's obligations within the Owens Valley. These factors too affect the need for groundwater pumping. The man-made factors are relatively predictable; precipitation and snowpack are not. The latter form the prime criterion of groundwater pumping need. It is logical to shift the average permitted use to a "hydrological year" of 12 months, commencing each April 1.

Inyo County asks that we avoid a formula calling for an average rate of extraction and simply fix a rate not to be exceeded at any time. Implicitly the county seeks to eschew the time factor. In a semi-arid clime, seasons or time cycles are an inevitable ingredient of water

availability and water resource management. Projected withdrawals must be keyed to projections of availability and need. A coordinated system of withdrawals calls for averaging. The county's request for a specification of a maximum groundwater pumping rate, without averaging, is not acceptable.

Inyo County contends that an interim limit on groundwater extraction is not enough; that the Los Angeles Department of Water and Power will compensate for decreased groundwater availability by curtailing supplies to its Owens Valley consumers while continuing to export undiminished water to Los Angeles. Thus the county seeks limitations upon diversion from "established uses and water courses within the Inyo-Mono Basin."

The contention requires a sharp distinction. Inyo County's pleadings, in the original superior court action and in the present mandate proceeding, sought compliance with CEQA only as that law applied to the city's projected increase of groundwater drawdown. This court granted relief within that relatively narrow compass.[3] Thus the city's long-range program for increased utilization of surface water by way of the enlarged Los Angeles Aqueduct (see County of Inyo v. Yorty, supra, 32 Cal.App.3d at pp. 798-800) has been and is outside the scope of this litigation.

Throughout the litigation the city has insisted that its long-range proposal for increasing total water export via the enlarged Los Angeles Aqueduct had been consummated before the effective date of CEQA, hence was exempt from that act.[4] In other respects both sides have indulged in a measure of ambivalence. Although its formal pleadings have been aimed at restraining groundwater use pending compliance with CEQA, Inyo County has persistently sought auxiliary restraints on surface water use, suggesting that the lawsuit involves the city's entire "water gathering" activities. At the inception of the proceeding, the city took the position that the lawsuit included the pumping of groundwater for export to Los Angeles via the enlarged Los Angeles Aqueduct

---

[3]In County of Inyo v. Yorty, supra, 32 Cal.App.3d at page 798, we stated: "Narrowly stated, the issue before us is whether City is required to file an EIR with reference to its continued extraction of subsurface waters from the Owens Valley area of County." The County of Inyo did not, by petition for rehearing or otherwise, seek to alter the issue so delineated.

[4]Thus, the final environmental impact report (Vol. 1, pp. A-7—A-8) declares: "The [second] aqueduct was placed into operation on June 26, 1970, five months before CEQA, and practically the full cost of the Second Aqueduct had been spent."

system.[5] As the proceedings developed, the city's position shifted until it arrived at its current position, which is that the increase of groundwater pumping is designed solely and entirely for use within the Owens Valley.[6]

We draw a distinction between the relatively limited scope of the main action and the effective range of an interim injunctive order. ■ A court exercising injunctive power may do so upon conditions that protect all—including the public—whose interests the injunction may affect. (*Inland Steel Co.* v. *U.S.* (1939) 306 U.S. 153, 157 [83 L.Ed. 557, 560, 59 S.Ct. 415].) The subsurface water which forms the subject of this lawsuit is one component of an integrated array of water resources—surface runoff, natural and artificial reservoirs, springs, groundwater basins and transport facilities. Control over such an array permits shifts from one source to another as natural needs or management desires may dictate. An interim stay order limiting groundwater pumping may be frustrated by diversions of surface water. (Cf. *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 936 [207 P.2d 17].) A judicially imposed reduction in groundwater pumping would ·be at the cost of local users if the Los Angeles Department of Water and Power decided to export an additional, compensatory amount of surface water to Los Angeles. Locally used water replenishes underground aquifers; exported water does not. Limited control over surface water exports is a necessary auxiliary to an effective groundwater pumping limitation.

Since May 1975 the city has lived with the 178.5 cfs pumping rate fixed by the superior court's order. Although the order stemmed from a misconception of this court's expectations, the city has fought for it on appeal. Inferably, it has represented a practicably expedient operating standard for more than a year. Together with such surface water as may have been supplied to local (Owens Valley) users, it has served the city's

---

[5]In our decision of June 1973 we accepted this representation at face value, for we stated: "The water to be used in the second aqueduct has three principal sources—increased surface diversions from Mono Basin, decreased spreading and irrigation of City-owned land in Mono and Inyo Counties, and increased pumping of groundwater reservoirs in the Owens Valley." (32 Cal.App.3d at p. 806.)

[6]One example of the city's revised position appears in its final environmental impact report dated May 1976 (Vol. 1, p. A-1), which declares: "The project is an increase in pumping from 89 cubic feet per second (cfs) to 140 cfs measured on a long-term average and from 250 cfs to 315 cfs during the highest single year. The increased pumping is necessary to supply uses of water on City of Los Angeles lands in Inyo and Mono Counties that were not anticipated in 1963 when the Second Aqueduct project was adopted."

local needs for more than a year. Thus, since May 1975, a customary standard of supply to local uses has been established. The department of Water and Power will be required to supply water to Owens Valley uses at the current levels, drawing, when and if necessary, upon surface as well as subsurface sources.

Ordinarily the decision of a Court of Appeal may not be enforced until 60 days after pronouncement. (*Moran* v. *District Court of Appeal,* 15 Cal.2d 527 [102 P.2d 1079].) Timewise, the present decision diverges from the ordinary. The establishment of an interim pumping rate (either by this court or by the superior court as its agent) is an exercise of pendente lite injunctive power, ancillary to this court's original mandamus jurisdiction. ■ A court of original jurisdiction has the power of immediate injunctive restraint to protect the status quo pending whatever review may thereafter occur. (*Union Interchange, Inc.* v. *Savage* (1959) 52 Cal.2d 601, 605 [342 P.2d 249]; *American Trading Co.* v. *Superior Court* (1923) 192 Cal. 770, 772 [222 P. 142].) Thus our order may be made effective immediately or at such time as we specify.

This order becomes effective on September 1, 1976. Effective on that date the interim pumping rate order of the superior court is vacated. Until further order of this court, respondents shall not withdraw water from the subsurface pool of the Owens Valley Groundwater Basin in excess of an average rate of 149.56 cubic feet per second for the period from September 1, 1976, through March 31, 1977, nor in excess of an annual average rate of 149.56 cubic feet per second for each successive twelve-month period commencing April 1, 1977. Respondents shall not decrease the quantities of water (whether from subsurface or surface sources) supplied to Owens Valley users below the levels customarily maintained since May 1975.

Regan, J., and Paras, J., concurred.