[Civ. No. 13886. Third Dist. Feb. 27, 1978.]

COUNTY OF INYO, Petitioner, v.
CITY OF LOS ANGELES et al., Respondents.

---

**COUNSEL**

L. H. Gibbons, District Attorney, and Antonio Rossmann for Petitioner.

Burt Pines, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, and Donald D. Stark for Respondents.

---

**OPINION**

**FRIEDMAN, J.**—We deny Inyo County's motion for imposition of costs (amounting to $1,067.61) and an attorney fee (of $85,267.50) against the adverse party, City of Los Angeles.

The lawsuit is an original mandate action in which Inyo County is the petitioner and Los Angeles the respondent. In 1973 we issued a peremptory writ of mandate directing the City of Los Angeles and its department of water and power to prepare an environmental impact

report covering their increased extraction and use of Owens Valley groundwater. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377]; see also, *County of Inyo* v. *City of Los Angeles* (1976) 61 Cal.App.3d 91 [132 Cal.Rptr. 167].) As its return to the writ of mandate the City of Los Angeles prepared and filed an environmental impact report. Through its district attorney and its retained special counsel, Inyo County presented briefs, exhibits and argument designed to demonstrate the invalidity of the environmental impact report. On June 27, 1977 we filed a decision sustaining the county's position. We held that the environmental impact report complied with neither the California Environmental Quality Act nor the writ of mandate. In the exercise of our continuing jurisdiction, we directed the city to take "reasonably expeditious action" to comply with the writ. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185 [139 Cal.Rptr. 396].) The state Supreme Court rejected the city's petition for hearing. The county then filed the present motion.

I

The parties debate the timeliness of the county's application. In prerogative writ proceedings in the appellate courts the prevailing party may be awarded costs but only by direction of the court in its judgment or before its judgment reaches finality. (*Union Trust Co.* v. *Superior Court* (1939) 13 Cal.2d 541, 543-544 [90 P.2d 582].) The city's charge of tardiness is based upon the "finality" of our June 1977 decision rejecting the city's return to the writ of mandate.

The time limitation voiced in *Union Trust, supra,* stems from the court's lack of jurisdiction after the lawsuit is terminated by a final decision. Our decision of June 1977 was an interim one which did not terminate the lawsuit; rather, it was characterized by a retention of continuing jurisdiction to enforce the writ of mandate until the latter had been satisfied. (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at p. 205; *County of Inyo* v. *City of Los Angeles, supra,* 61 Cal.App.3d at p. 95.) A peremptory writ of mandate does not necessarily exhaust the court's authority; where it does not provide complete relief, the court may continue the lawsuit and make such interim orders as the case may require. (*Gonzales* v. *Internat. Assn. of Machinists* (1963) 213 Cal.App.2d 817, 820 [29 Cal.Rptr. 190].) In the absence of a final judgment we retain jurisdiction over the parties and subject matter, as well as ancillary jurisdiction to award costs.

■ The claim for conventional costs of $1,067.61 covers the expenses of brief printing, a transcript and service of papers. These apparently embrace only the county's costs of resisting the city's insufficient return to the writ and not all costs since inception of the suit. The request is a piecemeal one. Possibly we need not await the suit's termination before awarding costs. In any event, we take our cue from the cost procedures in trial and appellate litigation generally. In a general way, these provide for costs as an incident to the ultimate judgment in the action. (Code Civ. Proc., §§ 1031, 1032, 1033; Cal. Rules of Court, rule 26(a).) If only as a matter of discretion, we defer action on Inyo County's partial bill for conventional costs until it is incorporated in a complete cost bill at the close of the lawsuit.

## II

We turn to the attorney fee claim. Section 1021, Code of Civil Procedure, is the California codification of the general American doctrine which denies attorney fees to victorious litigants unless provided by statute or contract. Inyo County's fee application is grounded on three rules or theories which various courts have recognized as nonstatutory exceptions to the general doctrine: the private attorney general rule, the substantial benefit rule and the vexatious litigant rule. (The county terms the last the "obdurate behavior" rule.)

These are three of the four principles, rules or concepts described in *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303], which we shall cite as *Serrano III*. *Serrano III* described two recognized California principles, rules or theories, stemming from the inherent equitable powers of the courts. " 'The first of these is the well-established "common fund" principle: when a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund. . . . ■ The second principle, of more recent development, is the so-called "substantial benefit" rule: when a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees.' " (*Serrano III*, at p. 34.)

■ *Serrano III* described two additional theories grounded largely in federal case law. "The first of these, involv[ed] awards against an

opponent who has maintained an unfounded action or defense ' "in bad faith, vexatiously, wantonly or for oppressive reasons" ' (11 Cal.3d at p. 26 [*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 (112 Cal.Rptr. 786, 520 P.2d 10)]) . . ." (*Serrano III* at p. 42; but see *Williams* v. *MacDougall* (1870) 39 Cal. 80, 85-86).

██ Quoting from an earlier California decision, *Serrano III* described the fourth, or private attorney general theory in these terms: "This concept, as we understand it, seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 27.) *Serrano III* went on to elaborate the private attorney general concept: "Thus it seems to be contemplated that if a trial court . . . determines that the litigation has resulted in the vindication of a strong or societally important public policy, that the necessary costs of securing this result transcend the individual plaintiff's pecuniary interest to an extent requiring subsidization, and that a substantial number of persons stand to benefit from the decision, the court may exercise its equitable powers to award attorney fees on this theory." (*Id.,* at p. 45.)

It is not certain whether *Serrano III* intended to postulate four separate standards whose discrete verbal forms would govern fee applications; or, whether it merely described several stock situations in which American courts, in the exercise of an historic discretionary power, have been habitually receptive to those applications. The verbalization of separate formulae seemingly requires a court to test each fee claim against each formula posed as its justification. The historic origin of the award was described and annotated in *Trustees* v. *Greenough* (1882) 105 U.S. 527 [26 L.Ed. 1157], *Sprague* v. *Ticonic Bank* (1939) 307 U.S. 161 [83 L.Ed. 1184, 59 S.Ct. 777], and *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240, 257-258 [44 L.Ed.2d 141, 153-154, 95 S.Ct. 1612]. See generally, Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds* (1974) 87 Harv.L.Rev. 1597; Hornstein, *Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards* (1956) 69 Harv.L.Rev. 658.) The doctrine was a unitary one, evoked by exceptional cases in equity, "part of the original authority of the chancellor to do equity in a particular situation" and to achieve justice "as between a party and the beneficiaries of his litigation." (*Sprague* v. *Ticonic Bank, supra,* 307 U.S. at pp. 166-167 [83 L.Ed. at p. 1187]; *Fletcher* v. *A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 323 [72 Cal.Rptr. 146].)

As occasions for the fee award expanded, as it was evoked by legal victories other than the "common fund" variety, appellate opinion writers resorted to a variety of *ad hominem* justifications for the expansion.[1] Other jurists then culled these expressions to bolster their own decisions, transmuting the *ad hominem* justification into stock formulae. The latter thus assumed the guise of rules, tending to freeze equitable individualization into relatively rigid, verbal molds. Possibly these "rules" are nothing more than an expression of judicially conceived, discretionary norms. Mr. Justice Frankfurter, author of the *Ticonic Bank* opinion, denigrated "formalities of the litigation" as keystone of the attorney fee award, emphasizing its discretionary essence: "As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility." (*Sprague* v. *Ticonic Bank, supra,* 307 U.S. at p. 167 [83 L.Ed. at p. 1187].)

## III

In describing its attorney fee claim, Inyo County points out that it seeks no payment for civil representation by its district attorney but only the reasonable value of the services of its special counsel, employed by the county since 1976 for the purpose of legal resistance to the proposals

[1]The substantial benefit "rule" apparently originated when the phrase "substantial benefit" was used as an *ad hominem* justification for a fee award in a stockholder's lawsuit involving the establishment of nonmonetary benefits. (*Bosch* v. *Meeker Cooperative Light And Power Ass'n* (1960) 257 Minn. 362 [101 N.W.2d 423, 426-427].) The phrase was then employed as useful shorthand in an opinion of the United States Supreme Court, *Mills* v. *Electric Auto-Lite* (1970) 396 U.S. 375, 393-395 [24 L.Ed.2d 593, 607-608, 90 S.Ct. 616].)

The "private attorney general" phrase was coined by Judge Jerome Frank in a decision which did not involve an attorney fee at all, but rather a private citizen's standing to sue for vindication of a public objective. (*Associate Industries* v. *Ickes* (2d Cir. 1943) 134 F.2d 694, 704; Comment (1974) 122 U.Pa.L.Rev. 636, 658.) A *per curiam* opinion of the federal Supreme Court then superimposed Judge Frank's metaphor —without crediting the author—upon the award of an attorney fee authorized by a federal statute. (*Newman* v. *Piggie Park Enterprises* (1968) 390 U.S. 400, 402 [19 L.Ed.2d 1263, 1265-1266, 88 S.Ct. 964]; see also *Bradley* v. *Richmond School Board* (1974) 416 U.S. 696, 719 [40 L.Ed.2d 476, 492-493, 94 S.Ct. 2006].) Judge Frank's apt metaphor attracted appellate opinion writers, for it soon left its restricted statutory mooring and drifted into wider waters, bobbing up in a variety of civil rights and public interest decisions and legal commentaries. (See *Fowler* v. *Schwarzwalder* (8th Cir. 1974) 498 F.2d 143, 145; *Lee* v. *Southern Home Sites Corp.* (5th Cir. 1971) 444 F.2d 143, 147-148; *La Raza Unida* v. *Volpe* (N.D.Cal. 1972) 57 F.R.D. 94, 98-102; Dawson, *op. cit.,* 88 Harv.L.Rev. p. 849 et seq.; Nussbaum, *Attorney's Fees in Public Interest Litigation* (1973) 48 N.Y.U. L.Rev. 301, 318 et seq.; Notes (1973) 24 Hastings L.J. 933; Comment (1974) 122 U.Pa.L.Rev. 636, 655 et seq.) Because the *per curiam* opinion in *Piggie Park, supra,* did not credit the author, Judge Frank's unwitting paternity seems to have been overlooked. Of such stuff are rules of law made.

of the City of Los Angeles. The county appends a copy of its fiscal year budget, pointing out that its population is small, its per capita costs of government large and its financial resources minuscule in comparison to that of the Los Angeles Department of Water and Power, whose budget exceeded $92 million in fiscal 1975-1976.

*Serrano III* adopted the private attorney general theory as a decisional rule in California, at least where the litigation had vindicated a public policy having a constitutional as opposed to a statutory basis. (20 Cal.3d at pp. 46-47.) Almost concurrently with *Serrano III,* the Legislature adopted the private attorney general concept in statutory form, through the enactment of Code of Civil Procedure section 1021.5.[2] The new statute did not become effective until January 1, 1978, somewhat later than the events underlaying the present claim.

An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." (*Serrano III,* pp. 45, 46, fn. 18.) Inyo County's application does not meet this basic condition.[3]

In support of the award Inyo County describes statewide values which its 1977 legal victory created. It points out that in 1977 the pressure of

[2]Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

The statute undoubtedly represents the California Legislature's reaction to *Alyeska Pipelines Co.* v. *Wilderness Society,* supra, which held that Congress alone could generate the avatar of equitable discretion bearing the private attorney general's mantle. Thus does the evolution of a homogeneous discretionary power permit its heterogeneous descendants to be selectively dispatched.

[3]In disposing of the private attorney general theory on substantive grounds, we abstain from several collateral inquiries, such as: (a) Whether Code of Civil Procedure section 1021.5, as a procedural statute in force at the time of this decision, supplies the criterion for the award. (See *Bradley* v. *Richmond School Board, supra,* 416 U.S. 696.) (b) Whether there is any reason in law or discretionary equity to follow *Serrano III's* self-imposed confinement to constitutional vindications. (c) If section 1021.5 governs here, whether its arguable prohibition against awards to public entities governs when two public entities are embroiled. (d) Whether either the decisional or statutory rules governing the fee award impose liability on the City of Los Angeles to pay for a legal victory assertedly won for the benefit of Californians generally.

this lawsuit constrained the Los Angeles Department of Water and Power to impose water consumption limits on its customers during the 1976-1977 drought; that this court's 1977 decision called for "a tangible, foreseeably effective plan for achieving . . . conservation goals" as an alternative to the city's proposals for increased water exportation from the Owens Valley (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at p. 203); that the experience generated by this lawsuit has demonstrated the feasibility of water conservation in the Los Angeles service area; that the litigation has provided palpable fulfillment of the statewide policy of water conservation voiced in article X, section 2 of the California Constitution. Thus, according to the county, its legal victory "has resulted in the enforcement of an important right affecting the public interest." (Code Civ. Proc., § 1021.5.)

On the assumption that the described benefits flowed statewide, the fee applicant has failed to establish that they were disproportionately important and valuable in comparison to its own. A county is a political subdivision of the state which provides state and local governmental services for its inhabitants. (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526].) Inyo County went to court as champion of local environmental values, which it sought to preserve for the benefit of its present and future inhabitants. This action is not a "public interest" lawsuit in the sense that it is waged for values other than the petitioner's. The litigation is self-serving. The victory won by the county in 1977 bulked large enough to warrant the cost of winning it. The necessity for enforcement by Inyo County did not place on it "a burden out of proportion to [its] individual stake in the matter." (*Serrano III, supra,* 20 Cal.3d at p. 46, fn. 18.) The application thus fails to satisfy a basic demand of the private attorney general concept.

Inyo County has pointed to its limited ability to bear the expense of extended and elaborate litigation and the relatively large financial capability of its opponent. Disparity of economic resources has played a role in some counsel fee decisions, but only where the basic requisites of the award were otherwise satisfied. (See for example, *Hall* v. *Cole* (1973) 412 U.S. 1, 13 [36 L.Ed.2d 702, 712, 93 S.Ct. 1943].)

IV

The "substantial benefit" concept supplies no better foothold for the fee application. It is implicit in all these award cases—whether rationalized as an exercise of equitable discretion or in terms of

judicially articulated rules—that the fee applicant had established a benefit common to himself and to those who are asked to share in the expense of his successful litigation. (*Serrano III,* 20 Cal.3d at pp. 38, 40, fn. 10.) The *substantial benefit* phrase would gain increased accuracy if the adjective *common* were inserted after *substantial.* The dominating quest for justice which prompted equity to grant the award is silent when the applicant has waged his lawsuit for an objective adverse to the interest of the party who is now asked to pay for it. The possibility of a fee award under these circumstances would arouse a conflict between the attorney's interest in the fee and the litigational interest of his client. Legal services on behalf of an openly or covertly hostile interest are invariably barred. (*Gabrielson* v. *City of Long Beach* (1961) 56 Cal.2d 224, 229 [14 Cal.Rptr. 651, 363 P.2d 883]; *Scott* v. *Superior Court* (1929) 208 Cal. 303, 307 [281 P. 55]; see also *Hobbs* v. *McLean* (1886) 117 U.S. 567 [29 L.Ed. 940, 6 S.Ct. 870]; Dawson: *op. cit.,* 87 Harv.L.Rev. at pp. 1636-1643.)

Nothing in *Serrano III* tempers the "adverse interest" ground for denying the award. The county, to be sure, points to water conservation benefits which its litigation brought to the City of Los Angeles. These benefits were a byproduct of a lawsuit whose main objective has been to delay and limit the city's extraction and export of Owens Valley groundwater. That objective is hostile to the city's interest in the restriction-free utilization of its groundwater resources. Adversity of interest causes rejection of the substantial common benefit theory.

## V

Finally, we turn to the "vexatious litigant" ground asserted in support of the attorney fee. We assume existence of power to make the award on this ground (see *Williams* v. *MacDougall, supra,* 39 Cal. at pp. 85-86), abstain from affirming the power and reject the claim for lack of merit.

Although the courts have employed a variety of pejorative terms to describe the behavior which evokes the theory, its authoritative expression occurs in *Alyeska Pipelines Co.* v. *Wilderness Society, supra,* 421 U.S. at page 259 [44 L.Ed.2d at page 154]: ". . . [A] court may assess attorneys' fees . . . when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .'" The rule is identically worded in *Hall* v. *Cole, supra,* 412 U.S. at page 5 [36 L.Ed.2d at page 707], *Serrano III,* 20 Cal.3d at page 42, and *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d page 26.

Bad faith is the central element activating the award. "In this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." (*Hall* v. *Cole, supra,* 412 U.S. at p. 5 [36 L.Ed.2d at p. 707]; see also, *Young* v. *Redman* (1976) 55 Cal.App.3d 827, 838 [128 Cal.Rptr. 86].) Bad faith may be found in actions leading to the lawsuit or in the conduct of the litigation. (*Hall* v. *Cole, supra,* at p. 15 [36 L.Ed.2d at p. 713].)

The law employs the standard of bad faith in many contexts; the meaning of the term necessarily varies with the context. In general, bad faith extends beyond fraud or dishonesty and embraces unfair dealing; it often denotes a deliberate refusal to perform without just or reasonable cause or excuse. (See *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173]; *Brandolino* v. *Lindsay* (1969) 269 Cal.App.2d 319, 325 [75 Cal.Rptr. 56].) As a ground for the attorney fee award, it gains color from the accompanying terms "wantonly, or for oppressive reasons." Bad faith, as an oppressive quality warranting a fee award, occurs when a defendant contumaciously deprives a plaintiff of his clear legal entitlement, forcing the latter into the expense of rescuing himself through legal action. (See *Williams* v. *MacDougall, supra,* 39 Cal. at pp. 85-86; *Huecker* v. *Milburn* (6th Cir. 1976) 538 F.2d 1241, 1245, fn. 9.) Bad faith is a question of fact in each case. (*River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 998 [103 Cal.Rptr. 498]; *Tancredi* v. *Garrett* (1962) 210 Cal.App.2d 818, 823 [27 Cal.Rptr. 52].)

■ In our 1977 decision rejecting the environmental impact report prepared by Los Angeles, we sharply criticized the report and the choices which had shaped it. We charged its authors with "wishful misinterpretation" of the project; complained of their fallacious assumptions; spoke of "incessant shifts among different project descriptions" which vitiated the report as a vehicle for intelligent public participation; charged the department of water and power with "calculated selection" of its truncated and erroneous project description. (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at pp. 195, 196, 197, 200.) Utilizing these criticisms, the county complains of obdurate behavior which forced it into legal expense to accomplish judicial rejection of the environmental impact report. The county also charges Los Angeles with obdurate behavior in supplying the court with inaccurate and misleading information, both in connection with the environmental impact report and in the course of debates over interim injunctive orders regulating water use. Los Angeles controverts these charges.

We find no bad faith on the part of Los Angeles in the sense of a motive or intention to oppress its opponent in litigation. To equate the misconceptions of the city's environmental impact report with bad faith is indulgence in Monday morning quarterbacking. In prospect, the city's interest would be served by a legally sufficient impact report, not one which evoked judicial rejection. Pending its compliance with our peremptory writ of mandate, Los Angeles' use of surface and ground-water had been restricted by interim restraining orders. (See, e.g., *County of Inyo* v. *City of Los Angeles, supra,* 61 Cal.App.3d at p. 91.) To satisfy the writ of mandate through a legally sufficient environmental impact report would provide it a prospect of relief from these restrictions. Environmental litigation is often waged for tacit objectives of delay and attrition. Given the adversary character of the litigation, Inyo County's purpose was to attack the environmental impact report, defeat it if possible and prolong the injunctive limitations on the city's water use. Its resistance to the environmental impact report was not impelled by the report's deficiencies but by its own litigational interests.

The accusation of factually inaccurate papers is de minimis. The accusation and its targets are shaped by the slanted perceptions of contending parties. Here, as elsewhere, the county's specifications fall short of a showing of bad faith.

The motion for costs and attorney fees is denied.

Puglia, P. J., and Evans, J., concurred.

A petition for a rehearing was denied March 15, 1978, and petitioner's application for a hearing by the Supreme Court was denied May 11, 1978. Richardson, J., did not participate therein.