[Civ. No. 13886. Third Dist. Sept. 30, 1981.]

COUNTY OF INYO, Petitioner, v.
CITY OF LOS ANGELES et al., Respondents.

**2**

COUNSEL

L. H. Gibbons, District Attorney, and Antonio Rossmann for Petitioner.

Burt Pines and Ira Reiner, City Attorneys, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, and Donald D. Stark for Respondents.

## OPINION

BLEASE, J.—We are called upon a second time to determine whether the City of Los Angeles and its department of water and power have complied with the California Environmental Quality Act and the writ of mandate issued by this court in 1973 (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 814-816 [108 Cal.Rptr. 377]) directing them to prepare an environmental impact report (EIR) covering their extraction of subsurface water in the Owens Valley. In 1977 this court said that the city's EIR, submitted in its return to the writ, did not comply with the writ because it failed to provide an accurate, stable and finite project description in accordance with the 1973 decision and also failed to describe reasonable alternatives to the project. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185 [139 Cal.Rptr. 396].) The city has submitted a second EIR by way of a return to the writ, to which the county objects inter alia on grounds paralleling those advanced by this court in rejecting the legal sufficiency of the first EIR. ▮ We shall sustain the county's objection on the grounds set forth below.

I

These protracted proceeedings are chronicled in *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795; *County of Inyo* v. *City of Los Angeles* (1976) 61 Cal.App.3d 91 [132 Cal.Rptr. 167]; *County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185; and *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82 [144 Cal.Rptr. 71], to which readers must repair for a complete understanding of this decision. We emphasize here those portions of the opinions necessary to this decision.

Beginning in 1900 the city acquired land and water rights in the Owens Valley which "at the present time [aggregate] 300,000 acres in Inyo and Mono Counties, comprising roughly 97 percent of the available privately held land." (32 Cal.App.3d at p. 799.)

In 1913 the city completed a surface aqueduct, the first aqueduct, between the Owens Valley and the city and began receiving Owens Valley water. The capacity of the aqueduct is a constant average flow of 430 cubic feet per second (cfs).

At a relatively early date, as an auxiliary to the natural precipitation in the area, the city commenced the drilling of a large number of wells to tap the subsurface pools of underground water in Owens Valley. These wells were heavily used during dry years to assure, as a supplementary source, a continuous and adequate flow through the first aqueduct. (32 Cal.App.3d at p. 799.)

In 1959 the city proposed "the construction of a second aqueduct to carry water from Owens Valley to the City for the purpose of completing 'the development of our Inyo-Mono supply that began over fifty years ago' and to insure that City would not lose certain water rights on which it had filed primarily in the Mono Basin development. [¶] Historically, the first aqueduct conveyed most of the available surface runoff from Owens Valley. It was planned that the second aqueduct would be filled largely from three sources: increased surface diversion from Mono Basin, reduced irrigation of City-owned lands in the affected counties and increased pumping of groundwater reservoirs in Owens Valley." (32 Cal.App.3d at p. 800.)

The design capacity of the two aqueducts is a constant average flow of 666 cfs, amounting to an increase in capacity occasioned by the second aqueduct of 236 cfs.

This action began in 1972 when the county sought injunction against the extraction of subsurface water for export from the Owens Valley, against the utilization of subsurface water in place of surface water within Inyo County and to require an EIR. "At that stage of the litigation, the city insisted that exportation of increased groundwater was an inseparable part of its second aqueduct, an 'ongoing project' completed prior to the effective date of CEQA and thus immune from the demands of CEQA." (71 Cal.App.3d at p. 193.)

We rejected the argument concluding, in sum, that "'while the capacity of the second aqueduct was fixed and known for a number of years before CEQA, the effect of its construction on subsurface water extraction has been a variable but steady escalation, dependent in large part, no doubt, upon the extent of seasonal rain and snowfall from year to year. Thus the ecological impact of the second aqueduct, viewed in conjunction with the underground pumping and measured by the quantity of extraction, has not been fixed but has substantially increased in severity in the period before, during and after its construction. . . . [¶] We conclude from the foregoing that the legislative intent so strongly ex-

pressed in CEQA can be met only by considering the expanded ground-water extraction as a "project" separate and divisible from the second aqueduct, and we so treat it.' (32 Cal.App.3d at p. 806.)" (71 Cal.App.3d at pp. 194-195.)

In its first EIR (May 1976) the city seized upon the "last quoted statement" to excise the part of the increased pumping rate, which it claimed was destined for export to the city (89 cfs) from "the CEQA-subject side of the line and place[d] it on the exempt side of the line" thus creating a CEQA-subject project of pumping which, "by a process of verbal transmutation, will now be devoted to in-valley use and not exported at all." (71 Cal.App.3d at p. 195.) We said that "the imper-missibly truncated" project definition severely distorted not only the actual project but the alternatives to the project. (71 Cal.App.3d at p. 201.)

We also said that the first EIR impermissibly created a *no*-project baseline for measurement of alternatives to the project different than the conditions preexisting the project. We concluded that "[b]ecause the final EIR does not include a genuine 'no project' alternative, be-cause its list of alternatives is not tied to a reasonably conceived or consistently viewed project, the Los Angeles EIR does not comply with CEQA's demand for meaningful alternatives. This lack results in an EIR which does not meet CEQA's goal of ensuring that 'the long-term protection of the environment shall be the guiding criterion in public decisions.' (§ 21001, subd. (d).)" (71 Cal.App.3d at p. 203.)

II

THE WRIT

This litigation began as pleadings, unaltered following the 1973 deci-sion of this court, which define the scope of the action as the continued extraction of subsurface waters from the Owens Valley. (*County of Inyo, supra*, 71 Cal.App.3d at pp. 190, fn. 4, 193.) The scope of this court's 1973 mandate was fashioned in view of the issues tendered.

This court has labored to make clear the requirements of its 1973 writ of mandate. In 1977 we explicated the 1973 decision in these words: "In any objective view the outlines of the 'project' conceived by our 1973 decision were quite clear. They were clear in 1973 and they

are clear now. Unfortunately there is a limit to the precision of words. Judicial opinion writers cannot always armor their language against wishful misinterpretation. At the risk of future misinterpretation we shall attempt the following reformulation of our 1973 formulation: The project which forms both the scope of this litigation and the subject of the EIR mandated by this court is the department of water and power's program for increasing the average rate of groundwater extraction and use (both for export and in-valley use) above a baseline rate reasonably representing the average rate of groundwater extraction and use (both for export and in-valley use) preceding the second aqueduct's availability for use." (Fn. omitted.) (71 Cal.App.3d at p. 196.)

In similar measure, we set out the "baseline" for consideration of *alternatives* to the project. We said: "In order to mark out a 'no project alternative,' the EIR should describe what condition or program *preceded* the project." (Italics added.) (71 Cal.App.3d at p. 201.) Thus, we held that for purposes of defining the project and measuring its impact and "'no project alternative,'" a baseline representing the conditions "*pre*ceding the second aqueduct's availability for use" must be utilized. (Italics added.) (*Id.*, at p. 196.)

We turn to examine the EIR's compliance with this mandate.

## III

### THE PROJECT DESCRIPTION

The resolution of the Board of Water and Power Commission of the City of Los Angeles, dated June 28, 1979, approving the final environmental impact report (FEIR) and approving the project reviewed by the EIR, describes the project as follows: "The Project, which is described in the EIR and is the subject of this Resolution, is to increase the pumping from the Owens Valley Groundwater Basin beyond historic pumping rates (long-term and maximum annual average): to supply water for use within the City of Los Angeles; to make the water available for agriculture, recreation, wildlife, and other uses on City lands within Inyo and Mono Counties; and for other uses in Owens Valley. The Project area is the Owens Valley Groundwater Basin in Inyo County."

Although an avowed purpose of the project is "to *make* ... water *available* for agriculture, ... and other uses ... within [both] Inyo and Mono Counties," the resolution limits the project area to the ground-

water basin in *Inyo* County and[1] asserts that "the diversion, export and occasional use of surface waters on City-owned lands in *Inyo and Mono Counties* is not a part of the Project."[2] (Italics added.)

The FEIR states that project increase in groundwater pumping will amount to 145 cfs "on an average annual basis," of which 66 cfs will be exported to city and 79 cfs "would be supplied directly or indirectly to uses in the Owens Valley."[3] There is then an asterisk and accompanying footnote which explicates "indirectly" as "the pumped water designated for irrigation or other use will flow into the Aqueduct and an equal amount of surface water will be diverted from a stream or ditch convenient to the location of use."[4]

Counsel for the city conceded on oral argument that *as a physical matter* virtually all of the additional pumped water will flow into the aqueducts and to Los Angeles.[5] Thus, the water to be "made available" for in-valley irrigation use is *surface* water. Yet the project definition

[1]*"Mono Basin Operations.* The Project does not involve pumping or diversions of water for export from the Mono Basin. A benefit of the Project is stabilitation of irrigation on City lands in Mono Basin by substitution or replacement of water. Such substitution or replacement in no way increases, decreases or affects the amount of water which may hereafter reach Mono Lake."

[2]*"Surface Diversions.* The increased groundwater pumping which constitutes the Project will be used to supplement surface flows, but the diversion, export and occasional use of surface waters on City-owned lands in Inyo and Mono Counties is not a part of the Project. Such surface diversions and the exercise of its diversion rights by the City of Los Angeles are ongoing exercises of practices and rights undertaken and fully implemented prior to the effective date of CEQA in November, 1970."

[3]"The increase in pumping, on an average annual basis, to *make available* water for project uses is 105,000 AF/yr. In wet years the increase in minimum pumping to provide for uses in Owens Valley (fish hatcheries and towns) is 33,000 AF/yr (45 cfs). In dry years the increase in maximum pumping to provide for all uses is 130,000 AF/yr. Of the 105,000 AF/yr (145 cfs) average annual increase in pumping, approximately 48,000 AF/yr. (66 cfs) would be used in Los Angeles and 57,000 AF/yr. (79 cfs) would be supplied directly or indirectly to uses in the Owens Valley." (Italics added.)

[4]"The supply resulting from increased pumping planned for use in Inyo and Mono Counties will be supplied directly or indirectly depending on the location of the use relative to the location of existing wells. In some cases the water will be supplied directly from wells such as *for* irrigation in the Bishop area. In other cases, where there are no wells, the supply will be indirect, i.e., the pumped water designated for irrigation or other use will flow into the Aqueduct and an equal amount of surface water will be diverted from a stream or ditch convenient to the location of use."

[5]Most of the wells are located in the lower end of the Owens Valley while most of the land to be irrigated is located in the upper end of the valley. There is no means for pumping the water up-valley.

excludes such water from the FEIR and consequently there is no express discussion whether surface water would in fact be available for in-valley uses.

There is considerable doubt on the matter. As we pointed out in an earlier opinion: "Historically, the first aqueduct conveyed most of the available surface runoff from Owens Valley. It was planned that the second aqueduct would be filled largely from three sources: *increased surface diversion* from Mono Basin, *reduced irrigation* of City-owned lands in the affected counties and increased pumping of groundwater reservoirs in Owens Valley." (32 Cal.App.3d at p. 800.) We were there speaking of an earlier plan. But that plan must have considered the physical realities of surface water availability.

We are told that the second aqueduct increases the capacity for export from 430 cfs to 666 cfs or 236 cfs and also that the projected annual average *increase* in pumping occasioned by the project is 145 cfs. *If* we assume that *all* of this pumped water is to be exported to Los Angeles, which, indeed, it largely is, as a physical matter, there still must be found an additional 91 cfs of *surface* water to meet the 666 cfs total export requirement, *wholly without regard to in-valley use.*

We are not told whether or how this deficiency is to be made up.[6] In fact, an examination of table D1-6 of FEIR, volume I, which displays the long-term surface runoff figures for Owens Valley, shows that *the entire historical flow would have to be diverted in order to meet project demands for surface water* (average demand 611 cfs). This is consistent with the declaration of Duane L. Georgeson, one of the city's aqueduct engineers, that: "From earliest planning to the present day utilization of increased ground water in the Owens Valley was a substantial part of the water required to fill the Second Barrel. Since the First Los Angeles Aqueduct conveys to the City of Los Angeles most of the available surface [runoff] from the Owens Valley, the Second Los Angeles [Aqueduct] had to be filled largely by other means."

---

[6]We are left to speculate. Perhaps the additional *surface* water for both export (91 cfs) and in-valley use (79 cfs) is to come from the Mono Basin, but the FEIR excludes that subject, as well, from the scope of the FEIR. The FEIR does show an increase in flow from Mono Basin of about 89 cfs (336 cfs to 425 cfs). This increase is never explained or discussed beyond the fact that the figure appears in a chart. There is no analysis of whether the 89 cfs will be sufficient to meet increased demand and there is no discussion of the long-term realiability of this source. Reduction in evapotranspira-

■ An EIR may not define a purpose for a project and then remove from consideration those matters necessary to the assessment whether the purpose can be achieved. ■ Since the FEIR removes the availability of surface water from examination it fails the legal duty and the mandate of this court to provide an informed and accurate analysis of the project and its impacts.

The deficiencies of the project description also show in the EIR's alternatives to the project, a subject to which we now turn.

## IV

### PRE-PROJECT AND NO-PROJECT ALTERNATIVE

■ As we have said, "[a]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." As a corollary to this requirement, the project must be compared with its *pre*-project conditions in order, inter alia, to provide a uniform baseline for the measurement of its impact and to "assess the advantage of terminating the proposal." (71 Cal.App.3d at p. 193.) This is called a "no-project" alternative and is required by law. (71 Cal.App.3d at p. 203; Cal. Admin. Code, tit. 14, § 15143, subd. (d).)

### A.

We found the previous EIR deficient because an "impermissibly truncated" project definition severely distorted not only the critical project *but the alternatives to the project.*

The county claims that a truncated project description was again adopted in order to conceal the fact that virtually all of the pumped wa-

---

tion (ET) might increase water availability for use by the project. Table D1-9 shows a reduction in ET loss of approximately 146 cfs:

Pre-Project ET: 822
Project ET: 676

However, table A6-1 (DEIR Appen. 6) shows that approximately 140 cfs of the reduced ET will be due to lowering of groundwater levels. ET from present high groundwater areas will drop from 330 cfs to 190 cfs. So only a small portion (approximately 6 cfs) of the reduction in ET will be reflected in increased surface flow. Even including the 89 cfs of surface water from Mono County and the increase of 6 cfs by reduction in ET, there is still missing some 75 cfs needed for in-valley use.

ter is destined for export to Los Angeles. The county claims: "(1) The EIR's project description arbitrarily and artificially defines the increased pumping as 79 cfs for uses in the Owens Valley and 66 cfs for export to Los Angeles, whereas almost all the new water supply made available by pumping of 155 cfs actually is intended for export to Los Angeles."

The claim was made the subject of a detailed comment by the county in response to the draft EIR. The county said: "Throughout the EIR, LADWP [city] attempts to disguise this unjustified and unannounced policy decision through the mask of arbitrarily dividing the putative 145 cfs of increased groundwater pumping between 66 cfs for export and 79 cfs for in-valley uses presently served by surface supplies. Yet a detailed and thorough evaluation of information contained in this EIR and other LADWP documents show that in fact virtually all of the 145 cfs is intended for export."

The county calculated the actual increase in export to Los Angeles by subtracting the capacity of the first aqueduct (430 cfs) from the combined capacity of both aqueducts (666 cfs), then deducted the increased surface water flow from Mono County (87 cfs) to arrive at an export figure of 149 cfs.[7]

The city responded to this criticism exclusively as follows: "This is an erroneous conclusion. Under *no*-project conditions, 600 cfs will be exported, which includes only 10 cfs of pumping, leaving 66 cfs, not 145 cfs to be met from pumping." The city here introduces a *no*-project export figure of 600 cfs. This figure is *not* the *pre*-project capacity of the first aqueduct (430 cfs), but is a wholly different figure.[8]

■ The establishment of this *no*-project alternative, predicated upon conditions different than those which preceded the project, criti-

---

[7]

| | | |
|---|---|---|
| "Project export | 666 | |
| (less) Pre-project export | −430 | |
| Total increase in export | 236 | |
| (less) Increase in export from Mono | − 87 | |
| Increase in export from Owens Valley | 149 cfs" | |

[8]At two other places in the FEIR, it is made clear that the no-project alternative is based upon use of *both* aqueducts at a flow rate in excess of the first aqueduct (430 cfs). The FEIR states that, under the no-project alternative the "export through the Aqueducts would be approximately 434,000 AF/yr (600 cfs)." In discussing the no-project irrigation alternative, the use of both aqueducts is premised. (See *post*, fn. 10.)

cally distorts the relation of the project to the export of water to the City of Los Angeles.

The 600 cfs figure is greater than the export of water using the baseline period "preceding the second aqueduct's availability for use" (fn. omitted) (71 Cal.App.3d at p. 196) (430 cfs average) and less than the long-term average capacity of *both* first and second aqueducts (666 cfs).

The difference between the no-project figure (600 cfs) and the project figure (666 cfs) is 66 cfs (which converts to 48,000 AF/yr), the precise amount which the city claims is the share of water from increased pumping which is to be exported to Los Angeles.[9]

Nowhere in the FEIR is there an explanation of how the 600 cfs is arrived at and it appears to be the product of subtraction of the amount of pumped water (66 cfs) which the EIR states is destined for Los Angeles from the long-term capacity of *both* aqueducts (666 cfs). The creation of a "synthetic" no-project alternative by such arithmetic means makes a sham of the EIR process and *invalidates the EIR.* We again hold that the project alternatives must be measured against the conditions preceding the second aqueduct.

## B.

In 1977 we similarly found that the first EIR was defective in providing a *"synthetic"* no-project alternative regarding the irrigation of valley lands (alternative 4).

We said: "Although alternative 4 is not labeled as the 'no project alternative,' the city asserts that it is actually tendered for that purpose. It fails to fulfill that purpose. *In order to mark out a 'no project alternative,' the EIR should describe what condition or program preceded the project.* Alternative 4 does not portray the pre-project stage; does not describe what quantities of water from what surface or subsurface

---

[9]"The essential element of the export component of this project is the increase in the average annual Second Aqueduct flow of 48,000 acre-feet of groundwater. Variations in annual pumping for export from the operational pattern of stable annual export are possible. Such variations may prove desirable to mitigate unanticipated short-term impacts of groundwater extractions in Owens Valley or to respond to operational problems within the Los Angeles water system. This flexibility in operations for the export requirements of the project is coupled with some flexibility in adjusting pumping patterns to mitigate unanticipated impacts in Owens Valley."

sources were supplied to what lands. The litigation record supplies some helpful data. For many years before the construction of the second aqueduct the city had supplied irrigation water (surface and subsurface) to ranchers on city-owned lands. The 1963 report on feasibility of the Second Los Angeles Aqueduct stated that total Inyo-Mono acreage (inclusive of Indian lands) then supplied with city irrigation water was 40,117 acres, of which 31,817 acres were supplied on an interruptible basis. (1963 Report, vol. VI, p. 6-13.) In 1973, 10 years later, [Duane L.] Georgeson filed an affidavit . . . stating that approximately 19,000 acres of city-leased land (11,000 in Inyo County and 8,000 in Mono County) were being supplied with irrigation water. The project described in the EIR would supply subsurface water for uses 'not anticipated' in 1963, when the second aqueduct was planned. As a purported 'no project' alternative to fulfilling these unanticipated uses, alternative 4 would deny water to both anticipated and unanticipated uses, including the bulk of land supplied in 1963. *Alternative 4 offers a synthetically conceived election between the synthetically conceived project and destruction of the Owens Valley cattle industry.* The EIR's project description and its purported 'no project' alternative simply do not match.

"     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .

"Because the final EIR does not include a genuine 'no project' alternative, because its list of alternatives is not tied to a reasonably conceived or consistently viewed project, the Los Angeles EIR does not comply with CEQA's demand for meaningful alternatives. This lack results in an EIR which does not meet CEQA's goal of ensuring that 'the long-term protection of the environment shall be the guiding criterion in public decisions.' (§ 21001, subd. (d).)" (Italics added.) (71 Cal.App.3d at pp. 201-202, 203.)

The first EIR was defective precisely because it created a no-project alternative based upon conditions different from those which "preceded the project." As a result, the first EIR made it appear that the project was necessary to *avoid something worse*, the "destruction of the Owens Valley cattle industry," a condition which did *not* precede the project.

It can readily be seen that any project can be made to look good by posing a "synthetic" "no-project" alternative consisting of the absence of the project plus some additional condition which is much worse than the project. That is what the first EIR did and that is what the present

EIR does in a repetition of the exact deficiency upon which we rejected the first EIR.

The current project description advances an irrigation "policy" which is claimed to provide a "secure supply" of water to irrigate certain lands within the Owens Valley. The EIR states: "Historically, groundwater was not available in the Owens Valley area on Los Angeles lands leased for agriculture. Surface water to irrigate up to 30,000 acres was available only after export requirements to Los Angeles were fulfilled. The feast-or-famine water supply caused ranchers to make significant economic decisions with high degrees of uncertainty. Groundwater pumping will provide a secure supply to irrigate the best 17,100 acres of the 30,000 acres irrigated during normal years under pre-project conditions. Total productivity would not be reduced significantly but economic stability is increased."

The EIR sets forth the no-project alternative as follows: "*Alternative A* is no-project. The groundwater basin would be pumped during dry periods to maintain flow in the *First Aqueduct* and to supply 600 acres of dairy land. The no-project pumping rates are 7,000 AF/yr. (10 cfs) long-term (1935-36 through 1965-66), and 97,000 AF/yr. (135 cfs) maximum (1960-61). This alternative necessarily involves dry year reduction in total water exported to Los Angeles and also involves *continuation of historic interruptible agricultural water.*" (Italics added.)

The italicized language appears to measure the no-project alternative by pre-project ("historic") conditions involving supply of the First Aqueduct. But the explication of alternative A in the EIR belies the appearance.[10]

---

[10]The EIR's right hand does not appear to know what its left hand is doing.

In response to the County of Inyo's claim that "[t]he statement that the 'no project alternative describes water use policies prior to 1970' is completely untrue and is contradicted by the description given on Page 11-4," the city said: "Disagree. There is no inconsistency between the two descriptions. The irrigation records and lease provisions are indications of policies prior to 1970."

However, elsewhere the city states: "The water supplies for irrigation in the Owens Valley for pre-project, no-project, and project conditions are provided in Section B, page 11-5 of this Final EIR" (FEIR, vol. II, p. II-7) and also states: "The no-project alternative describes First and Second Aqueduct operations, without increased pumping. *This condition did not exist in the pre-project period.* Refer to Section B, Pages 3-2 and 11-5 of this Final EIR." (Italics added.)

The details are shown in a chart and description in the Final Environmental Impact Report, volume I, pages B11-4 to B11-5.[11]

The chart makes plain that the no-project alternative is not only different than the pre-project "historic" irrigation use, but that it utilizes *both* the first and second aqueducts for export. The chart reveals that the no-project alternative *reduces* the "historic" (*pre*-project) water delivery for irrigation by at least half and contemplates 18 dry years, as opposed to 5 historic dry years, out of a 31-year period. The EIR gives no coherent description of the impact of the no-project alternative upon Owens Valley agriculture, although the fact that in 18 years out of 31 no water would be provided (other than for 600 acres of dairy farming) makes the impact palpably disastrous for Owens Valley agriculture.

Because the EIR does not include genuine no-project alternatives, because its project description impermissibly removes an essential element from the matters required to be considered, because the alternatives are not tied to a consistently viewed project, the second EIR does not comply with mandate of this court and the requirements of CEQA.

DISPOSITION

We hold that the city's return to the writ of mandate issued as a result of our June 1973 decision fails to comply with the writ. This court has continuing jurisdiction to enforce the writ until it is fully satisfied.

---

[11]"The following table provides data on the No-Project operation described in this alternative, the actual historical irrigation experience during which surface water was exported only through the First Los Angeles Aqueduct, and the proposed project. The comparison is based on runoff data for the 31-year hydrologic study period (1936-1966).

OWENS VALLEY IRRIGATION
Average Supply in Acre-Feet/Year for 31-Year Study Period

| Irrigation Policy | Historical[1] | | No-Project[2] | | Project[3] | |
|---|---|---|---|---|---|---|
| | No. of Yrs. | Irrigation | No. of Yrs. | Irrigation | No. of Yrs. | Irrigation |
| Full | 17 | 102,000 | 7 | 106,000 | 29 | 72,000 |
| Partial | 8 | 72,000 | 6 | 55,000 | 2 | 59,000 |
| None (Dairy Land excluded) | 5 | 0 | 18 | 0 | 0 | 0 |

(1) Maximum 30,000 acres interruptible irrigation, no groundwater pumping for irrigation, First Aqueduct export. Irrigation data not available for 1936.
(2) Maximum 30,000 acres interruptible irrigation, no groundwater pumping for irrigation, First and Second Aqueduct export.
(3) Maximum 17,000 acres regular irrigation, groundwater pumping for irrigation, First and Second Aqueduct."

(Code Civ. Proc., § 1097; *County of Inyo* v. *City of Los Angeles, supra,* 61 Cal.App.3d at p. 95.) The writ is not discharged but remains in force; the City of Los Angeles and its department of water and power are directed to take reasonably expeditious action to comply with it. Interim restraints upon the rate of extraction of groundwater and upon the decrease of water supplied to Owens Valley uses will remain in effect.

Puglia, P. J., concurred.

EVANS, J., Dissenting.—As I review the history of this protracted and sometimes bitter proceeding, I perceive the issue confronting the court to be narrowly confined rather than as broad and all-encompassing as do the majority. The question to be resolved should be confined to whether the City of Los Angeles (City) has complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; unless otherwise indicated, all code references will be to that code). On that narrowly confined issue, I would reject the county's objection and conclude that the present EIR complies with those requisites.

This proceeding represents an underlying ultimate conflict between the parties over the allocation of decreasing resources among diverse increasing needs. The previous history of the litigation is found in *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377]; *County of Inyo* v. *City of Los Angeles* (1976) 61 Cal.App.3d 91 [132 Cal. Rptr. 167]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App. 3d 185 [139 Cal.Rptr. 396]; and *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82 [144 Cal.Rptr. 71]. I believe analysis of those decisions is essential to a resolution of the present case, and I will make specific reference to them when necessary to explain my conclusion.

By way of general summary, this court held in *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795, that CEQA required the City to prepare, certify, and file an EIR relative to its continued and increased extraction of subsurface waters from the Owens Valley and issued a peremptory writ ordering the City to do so.

In *County of Inyo* v. *City of Los Angeles* (1977), *supra,* we found the City's first EIR legally insufficient as it failed to provide "an accurate, stable and finite project description." Specifically, the report's truncated project description was limited to a discussion of increased pumping de-

signed for in-valley use and excluded increased subsurface extractions for export to Los Angeles. We also held the first EIR deficient as it failed to provide discussion of all reasonable alternatives to the project; specifically, it failed to provide a genuine "no project" alternative in the form of a "tangible, foreseeably effective plan for achieving distinctly articulated water conservation goals within the Los Angeles service area." (71 Cal.App.3d at p. 203.)

In its present return and motion for order discharging the writ, the City contends the EIR, which was approved and certified by its board of water and power commissioners on June 28, 1979, is a "thorough, well-executed environmental assessment of the described project," which fully complies with CEQA and the prior decisions of this court.

The county, however, disputes its sufficiency and seeks to expand the scope of the proceeding by a "supplemental writ" commanding City to refrain from groundwater pumping in the Owens Valley and to refrain from reducing surface supplies to local users until the City prepares an expanded supplemental EIR extending the scope of inquiry to that which was suggested by the dictum contained in the opinion of this court in *County of Inyo* v. *City of Los Angeles, supra*, 71 Cal.App.3d at pages 204-205, and to include discussion of all alternatives of effective water conservation in Los Angeles, selection of substitute sources of water, and an analysis of the interrelationship of surface and subsurface extractions and export to Los Angeles via the first aqueduct and the proposed subsurface takedown by increased pumping for both local and City use. The county further alleges that the City's present and proposed extraction of subsurface water in Owens Valley is an unconstitutional waste and deprives the county, as the county of origin, of its right to water necessary for the protection and development of its environment and economy.

The county also seeks an order directing the City to reduce the interim pumping rate of 89 cubic feet per second (cfs), arguing such a reduction would effect a balance between the need to mitigate existing environmental damage against the City's need to rely upon the availability of Owens Valley subsurface water.

Preliminarily, I would reject county's attempt to enlarge the scope of the present underlying writ. With the exception of arguments addressed to the legal adequacy of the EIR, the supplemental petition raises factual and legal issues beyond the focus of the existing controversy. The

essence of the county's argument is that the City should be required to prepare a comprehensive EIR encompassing its entire water gathering system and contends that an EIR concerning increased groundwater extractions alone is inherently insufficient because of the interrelationship between ground and surface water in the Owens Valley and between the Owens Valley and other supplies. In *County of Inyo* v. *City of Los Angeles* (1977), we limited the subject matter of this litigation to the measurement of the legal sufficiency of an EIR respecting the projected increase in subsurface drawdown in the Owens Valley. However, in "deliberate dictum," we rejected any implication that the City's compliance with the writ in this case would necessarily constitute the "full measure" of the City's CEQA imposed obligations relating to its water management activities, and expressed our willingness to review the legal sufficiency of the City's environmental report on subsurface extraction within an EIR of larger scope should the City elect to do so. (71 Cal. App.3d at pp. 204-205.) However, I point out that City was not obligated to do so and for whatever reason has not chosen to proceed with such an enlarged comprehensive report. I therefore reiterate that in accord with the prior writ, the sole inquiry in this proceeding should be limited to a determination of whether the City's EIR relative to increased pumping of subsurface water in the Owens Valley meets CEQA requirements. (See also *County of Inyo* v. *Yorty* (1973), *supra*, 32 Cal. App.3d 795.) The scope of the inquiry by the EIR urged by the county presents a myriad of factual and legal questions that far exceed the scope of the inquiry as defined by the court in 1976 (61 Cal.App.3d 91) and again in 1977 (71 Cal.App.3d 185). The interrelationship question alone brings into inquiry the status of the first aqueduct project, i.e., whether or not it is a completed project exempt from the scope of CEQA (Pub. Resources Code, § 21151) or whether it is an ongoing project subject to those provisions, as well as the nature and scope of the water rights originally acquired by the City and whether the second aqueduct project encompasses the first project sufficiently to require comprehensive inclusion in the EIR under consideration.

This threshold question should be answered affirmatively before this court or any other tribunal may require the City to analyze the relationship of the first aqueduct project which continues to export surface and subsurface water, with the projected takedown of subsurface water levels by the second project's local and export needs.

In the first instance in 1973 and again in 1976 and 1977, neither the parties nor the participating members of this court considered the scope

of inquiry by the EIR should include the City's total water project. Although such an inquiry has most attractive environmental possibilities and might ultimately be required, it is beyond the established periphery of this writ proceeding. It is for these reasons that I would decline the invitation by the county to enlarge the extent of the inquiry. This is neither the tribunal nor legal vehicle by which such an investigation into legal and factual problems should be pursued.

The conclusion reached by the majority effectively grants, sub silentio, the request of the county to expand the scope of the writ and requires analysis and discussions in the EIR of the interrelationship between the extraction or takedown of the subsurface water and the continuing export of surface water in aqueduct No. 1.[1] This requirement is not found within the bounds of this court's description of the scope of the original writ.

## I

In *County of Inyo v. City of Los Angeles, supra,* 71 Cal.App.3d at page 189, we described the scope of judicial review of an EIR. "Consideration of a filed EIR's adequacy is a judicial function. (*Environmental Defense Fund, Inc. v. Coastside County Water Dist.* (1972) 27 Cal. App.3d 695, 704 [104 Cal.Rptr. 197].) In a lawsuit charging noncompliance with CEQA, judicial inquiry is limited to the question of abuse of discretion, which is established if the agency has not proceeded as required by law or if its decision is not supported by substantial evidence. (§ 21168.5; *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 74 [118 Cal.Rptr. 34, 529 P.2d 66].) The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 725-726 [117 Cal. Rptr. 96]; *Environmental Defense Fund, Inc. v. Coastside County Water Dist., supra,* 27 Cal.App.3d at p. 705; see also *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 593 [122 Cal.Rptr. 100].)"

We also observe at page 192 that "[t]he EIR is the heart of the environmental control process. (*County of Inyo v. Yorty, supra,* 32 Cal.

---

[1]Counsel for the county conceded at oral argument that in order to reach the interrelationship conclusion which is the foundation of the ultimate majority decision, the motion to expand the scope of the writ must first be granted. This was apparently accomplished by indirection.

App.3d at p. 810.) CEQA describes the report's purpose—to provide the public and governmental decision-makers (here, the board of water and power commissioners) with *detailed information* of the project's likely effect on the environment; to describe ways of minimizing significant effects; to point out alternatives to the project. ([Pub. Resources Code] §§ 21002.1, 21061, 21100; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049].) The EIR process facilitates CEQA's policy of supplying citizen input. (See *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841 [115 Cal.Rptr. 67].) By depicting the project's unavoidable effects, mitigation measures and alternatives, the report furnishes the decision-maker information enabling it to balance the project's benefit against environmental cost. (See § 21100; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d at p. 705.) The report should function as an environmental 'alarm bell.' (*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at p. 810.)" (Italics added.)

In 1977, we found the first EIR's project description inadequate by its limitation to a consideration of increased water pumping designed for in-valley use only. At that time we again explicitly defined the parameters of the project: "The project which forms both the scope of this litigation and the subject of the EIR mandated by this court is the department of water and power's program for increasing the average rate of groundwater extraction and use (both for export and in-valley use) above a baseline rate reasonably representing the average rate of groundwater extraction and use (both for export and in-valley use) preceding the second aqueduct's availability for use." (Fn. omitted; *id.,* at p. 196.)

I conclude that the present EIR follows that admonition and in the first chapter summarizes its scope in part as follows:

*"Project Description*

"The project is to increase the pumping of groundwater from the Owens Valley basin beyond historic pumping rates (long-term and maximum annual average): to supply water for use within the City of Los Angeles; to make available water for agriculture, recreation, wildlife and other uses on City lands within Inyo and Mono Counties; and for other uses in Owens Valley."

The report further develops that, to carry out the project, pumping will increase by an average of 105,000 acre-feet/year (AF/Yr.) (145 cubic feet per second [cfs]) above the average historical pumping rate (the "no-project" rate). The minimum pumping increase in wet years will be 33,000 AF/Yr. (45 cfs) and the maximum pumping increase in dry years will be 130,000 AF/Yr. (180 cfs).

The report states the historic pumping rate (no-project) would continue and would require subsurface pumping to maintain flow in the first Los Angeles aqueduct and to supply irrigation water for 600 acres of dairy land; the historic pumping rate is 7,000 AF/Yr. (10 cfs) long term (1935-1936 through 1965-1966) and 97,000 AF/Yr. (135 cfs) maximum (1960-1961).

The section concludes, "Under the recommended project, the increased pumping in any given year will be varied within the above limits in order to make water available for all of the following uses: 1) export to meet water needs in Los Angeles; 2) regular irrigation of 17,100 acres of land owned by Los Angeles and water for expanded recreation and wildlife habitat enhancement programs; and 3) water for town supplies and fish hatcheries in the Owens Valley. On a long-term average, approximately 48,000 AF/Yr. will be exported to Los Angeles and the increased pumping will make available approximately 57,000 AF/Yr. of water for uses in the Owens Valley." (Fn. omitted.) In that portion of the report entitled *"Project Operations"* the City has stated:

"The increase in pumping, on an average annual basis, to make available water for project uses is 105,000 AF/yr. In wet years the increase in minimum pumping to provide for uses in Owens Valley (fish hatcheries and towns) is 33,000 AF/yr. (45 cfs). In dry years the increase in maximum pumping to provide for all uses is 130,000 AF/yr. Of the 105,000 AF/yr. (145 cfs) average annual increase in pumping, approximately 48,000 AF/yr. (66 cfs) would be used in Los Angeles and 57,000 AF/yr. (79 cfs) would be supplied directly or indirectly to uses in the Owens Valley. [Fn. omitted.]

"·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·

"Increased groundwater pumping will ensure the availability of a regular irrigation supply to 17,100 acres and to the other project uses in Los Angeles and Inyo and Mono Counties during 29 of the 31 years of the hydrologic study period. For irrigation in Inyo and Mono Counties

this means at least 72,000 acre-feet per year for 29 years of the 31-year hydrologic study period for a total of at least 2,088,000 acre-feet. During each of 13 of those 29 years, approximately 7,000 acre-feet would be available for irrigation as an additional supply, bringing the total of 2,179,000 acre-feet. Partial supplies would be available during the other two years. The irrigation supplies during those 2 years would total 118,000 acre-feet, bringing the grand total of the irrigation supply made available by the project during the study period to 2,297,000 acre-feet." (Italics omitted.)

The increased subsurface pumping will generally occur at existing wells, and the increased water supply will in most instances be conveyed through existing water courses in the Owens Valley.

In support of its challenge to the adequacy of the report, county asserts a failure to comply with CEQA because its project description "arbitrarily and artificially" defines the increased pumping as 48,000 AF/Yr. (66 cfs) for export to Los Angeles and 57,000 AF/Yr. (79 cfs) for use in the Owens Valley and contends that virtually all new water supply made available by the increased pumping is intended for export to Los Angeles.

The basis for the county's assertion is extremely unclear. A similar unsubstantiated allegation was made in comments to the *draft* EIR by the Secretary of the State Resources Agency. The City denies the contention and asserts export from the Owens Valley would be limited to an increase of 11 percent (from 434,000 AF/Yr. to 482,000 AF/Yr.). The data submitted by the county in support of its position is contained in a chart which accompanied county comments to the draft EIR; the City characterizes the opposing chart information as based on an "erroneous conclusion."

Again, I emphasize that the scope of this proceeding should be confined to the legal adequacy of the EIR related to increased subsurface extraction of water by City in the Owens Valley. Although an EIR broader in scope which included management of surface water in conjunction with increased groundwater extraction may have been desirable, it was not required under the clear terms of the prior writ.

Unlike its predecessor, the present EIR maintains a consistent project description which encompasses all increased extraction of subsurface water regardless of destination. The description is clear and unambi-

guous in its assessment of the total increase in pumping and is equally informative as to the quantity of water to be exported to Los Angeles and the quantity that will be made available (directly or indirectly) for use in the Owens Valley. The City unequivocally denies the county's charge that substantially all water made available by the project will be exported; the City explicitly states that exports from the Owens Valley would be increased by 11 percent.

The scope of our review does not extend to a prediction of whether those who complete the project will deviate from its stated purpose and objectives. The project description contained in the present EIR overcomes the prior deficiencies found by the court (1973, 1976, 1977, and 1978) and satisfies the legal requirements of CEQA. Whether or not the City will confine its pumping and export of water to the stated project limits is a matter to be determined subsequently and by a proper tribunal. It is not for this court to decide by indulging in speculation.

## II

Many of the county's objections to the final EIR involve disputes over the methodology and accuracy of the report's conclusions regarding the environmental effects of the proposed project. In its opposition to the motion to discharge the writ, county has submitted a plethora of comments and declarations of state water officials, various hydrologists, botanists, economists, other scientists, and residents of Inyo County which criticize and challenge the accuracy of the conclusions of both the draft and the final EIR. Essentially they accuse the report of failing to state fully the environmental harm resulting from the project. A substantial number of these exhibits were prepared after the City's board of water and power commissioners approved the final EIR. Since the single inquiry is confined to the legal sufficiency of the EIR, and these later exhibits were not part of the record before the board, they should not be subject to consideration in this proceeding. However, in arriving at my conclusion, I have considered them, as well as the adverse comments made to the draft EIR; in essence I find them to be merely challenges by one group of experts to the conclusions of other experts. County has, in submitting the expert argument, apparently ignored our observation in *County of Inyo* v. *City of Los Angeles, supra,* 71 Cal. App.3d at page 197, that "[c]ourts are not equipped to select among the conflicting opinions of warring experts. It is not the function of the court to determine the accuracy of the report's environmental forecasts. [Citations.] Reasonable foreseeability is enough. [Citation.]"

The terms of the final EIR are clear that the proposed project will adversely affect the environment of the Owens Valley. Primarily, these harmful effects result from a lowering of the water table by reason of the increased pumping. Within the zone of influence of the pumping wells, the lowered table will cause springs to dry, vegetation will change on 69,000 acres (43 percent of the valley floor), specifically a replacement of moisture-loving plants with semi-desert species will take place; the population of some species of fauna will be reduced, and they will be required to modify their range of habitat in response to vegetation changes. However, no species are threatened with extinction. Diversion of surface water into six affected springs will maintain a wet habitat and partially mitigate some of the impact on flora and fauna at those locations. The report states that impact on air quality in the Owens Valley cannot be estimated with reasonable accuracy, although it does acknowledge that reduced vegetation will cause increases in particulate concentrations during seasonal dust storms and could cause increases in suspended particulate during lower wind conditions.

I find the final EIR does forecast those environmental impacts of the project which are reasonably foreseeable.

### III

County next challenges that portion of the report dealing with alternatives to the project. The argument is made that the stated alternatives do not meet CEQA guidelines as they assertedly fail to compare each alternative to no-project conditions. I find the contention to be baseless. Each alternative is compared to the project and makes some comparison to no-project conditions.

The county also argues the report fails to adequately define alternatives to the project. Specifically, the argument is made that development of the alternative of conservation is again not considered. Again, I conclude the contention is blatantly in error. The report presents, in considerable detail, five alternatives, including alternate "B" dealing with conservation in both Los Angeles and the Owens Valley. "A" thoroughly discusses "no-project."[2] Alternate "C" deals with water

---

[2]The report states that historically, Owens Valley groundwater was not available on Los Angeles lands leased for agriculture. Only after export requirements to Los Angeles were fulfilled was surface water available to irrigate up to 30,000 acres of City-owned land. The report states the project will furnish a secure supply to irrigate the best 17,100 acres of the 30,000 acres irrigated during normal years under preproject conditions. Total productivity would not be reduced significantly but economic stability would be increased.

reclamation (treated domestic sewage effluent) which is also another form of conservation. "D" relates to lining with concrete, 93 miles of canals and ditches on City-owned land in the Owens Valley as a seepage retardant, and finally, "E" deals with maximum production of groundwater for uses not projected in the proposed undertaking.

Alternative "B" deals with the implementation of water conservation programs in Los Angeles and the Owens Valley. Activation of a mandatory conservation ordinance is to be required to achieve at least a 10 percent reduction in use up to a maximum reduction of 20 percent; such need reduction is expected to be necessary 45 percent of the time. Water needs remaining after implementation of a maximum mandatory conservation rate would then be met by increased groundwater pumping in the Owens Valley. Increased pumping is expected to occur 20 percent of the time; at that time the average annual export pumping would increase from 7,000 AF/Yr. no-project level to 9,000 AF/Yr. with a dry year peak-pumping rate of approximately 111,000 AF/Yr. Improved irrigation efficiencies on City-owned land in Owens Valley is also included.

I perceive county's conservation objection essentially as a disagreement with the policy decision to reject total conservation as a desirable alternative to the project. Again, in contrast with the first EIR, the present report overcomes the previous deficiency of total omission of a conservation alternative. (See County of Inyo v. City of Los Angeles, supra, 71 Cal.App.3d at p. 203.)

Finally, county asserts an inadequacy in the specification of feasible measures in mitigation of environmental damage. Once again, the contention ignores applicable judicially established criteria.

"It is true that an environmental impact report must identify both feasible mitigation measures and feasible project alternatives. (§§ 21002, 21002.1, subds. (a), (b).) But if the feasible mitigation measures substantially lessen or avoid generally the significant adverse environmental effects of a project, the project may be approved without resort to an evaluation of the feasibility of various project alternatives contained in the environmental impact report. Furthermore, if economic or social conditions make infeasible the mitigation of one or more significant adverse environmental effects of a project, such project may

nevertheless be approved provided the project is otherwise permissible under applicable laws and regulations. (§ 21002.1, subd. (c).) [¶] ... CEQA does not mandate the choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has reduced environmental damage from a project to an acceptable level." (*Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, 520-521 [147 Cal.Rptr. 842].)

The proposed feasible mitigation measures of the environmental effects identified in the EIR include diversion of surface water into six springs to maintain a wet habitat which will partially lessen vegetation changes and corresponding reduction in the population of various fauna at those locations. Domestic livestock will be removed from City lands if competition with Tule elk develops. Further mitigation of the vegetation change and of the lowering water table were not deemed to be feasible. Identification of mitigation measures with respect to air quality was also characterized as infeasible. The report also provides for other means which will minimize stress on vegetation by excluding the areas containing rare and threatened plant species from grazing pressure; it also provides for a range management program and one of controlling undesirable plants (i.e., saltcedar, a highly competitive phreatophyte).

In its resolution approving the project, the City's board of water and power commissioners made findings identifying those measures as feasible mitigation steps, considered the circumstances which made infeasible the identification or adoption of additional mitigation measures, and considered economic, social, and other factors which made the alternatives to the project not feasible.

The board acknowledged that inherent in the project were significant adverse environmental effects, especially on water levels and flora, which could not be fully mitigated. Nevertheless, the board determined the need to provide a reliable, long-term, and dry-year water supply to City, the relatively lower cost of water provided by the project, and the generation of clean hydroelectric power by the project were "overriding considerations" and justified approval of the project.

I find the foregoing summary of the mitigation measures as indicative of the report's adequacy.

There is substantial evidence in support of the board's findings of specific economic and social conditions which supersede the project's

admitted adverse environmental consequences and support its approval of the project.

I would conclude that the extent of our review has been completed; the merits of policy choices transcend the scope of that review. I find the City's final EIR complies with the requisites of CEQA and meets the mandate of our previous writ.

In reaching that conclusion, I have strictly adhered to those principles of review stated in *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 909-910 [165 Cal.Rptr. 401] (hg. den.), "'A 'major purpose of an EIR is to inform other governmental agencies, and the public generally, of the environmental impact of a proposed project ...' and to inform the decision-making agency of the full range of adverse environmental effects and alternative measures prior to its decision to approve or disapprove such project ..., the underlying policy of the act to '[e]nsure that the long-term protection of the environment shall be the guiding criterion in any public decision' (§ 21001, subd. (d)), dictates that the 'initial and primary responsibility for striking [the necessary] balance between competing concerns must rest with the [decision-making] agency itself, ...' [citations] and whose consideration cannot be merely a 'post hoc rationalization' of a decision already made.'"" (P. 907.) "An EIR must describe all reasonable alternatives to the project (Pub. Resources Code, § 21061), including those capable of reducing or eliminating environmental effects; the specific alternatives of 'no project' must also be evaluated (Pub. Resources Code, §§ 21002, 21100; Guidelines, Cal. Admin. Code, tit. 14, § 15143, subd. (d)). [Citation.] The discussion of alternatives need not be exhaustive, and the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible, given the limitation of time, energy and funds. 'Crystal ball' inquiry is not required.

"The statutory requirement for consideration of alternatives must be judged against a rule of reason. There is no need for the EIR to consider an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative .... *Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.* It is only required that the offi-

cials and agencies make an objective, good-faith effort to comply." (Italics added; pp. 909-910.)

I would deny the county's motion to reduce the interim pumping rate and its petition for a supplemental writ.

The majority opinion by indirection effectively has expanded the scope of the writ as requested by the county.

That issue should have been directly confronted and either granted or denied. Instead I find the majority opinion and result to be based upon an undescribed expansion of the writ, transcending the stated limits required of the parties prescribed in the first instance.

A petition for a rehearing was denied October 28, 1981. Evans, Acting P. J., was of the opinion that the petition should be granted but for reasons other than those proposed. Respondents' petition for a hearing by the Supreme Court was denied December 9, 1981.