Filed 6/30/22; certified for publication 7/26/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COUNTY OF MONO et al.,<br><br>     Plaintiffs and Respondents,<br>v.<br>CITY OF LOS ANGELES et al.,<br><br>     Defendants and Appellants;<br><br>DEPARTMENT OF FISH AND WILDLIFE,<br><br>     Real Party in Interest. | A162590<br><br>(Alameda County Super. Ct. No. RG18923377) |

The City of Los Angeles, Los Angeles Department of Water and Power (LADWP), and Los Angeles Department of Water and Power Board of Commissioners (collectively, Los Angeles) appeal from the trial court's judgment granting the petition of Mono County and the Sierra Club (collectively, Mono County) for a writ of mandate directing Los Angeles to comply with the California Environmental Quality Act (Pub. Resources Code[1], § 21000 et

---

[1] Undesignated statutory citations are to the Public Resources Code.

1

seq.) (CEQA) before curtailing or reducing deliveries of irrigation water to certain lands Los Angeles leases to agricultural operators in Mono County.  The trial court ruled that Los Angeles implemented a project in 2018 without complying with CEQA when (1) it proposed new leases to the lessees that, unlike the prior leases, would not provide or allow water to be used for irrigation, and (2) while claiming it would study the environmental effects of the new leases, it nonetheless implemented that policy of reducing water for irrigation by allocating less water than usual under the prior leases that were still in effect.

Los Angeles does not dispute that it is required to engage in CEQA analysis before implementing the new proposed leases, and it notes that it has issued a notice that it is undertaking environmental review of those new leases.  But it argues that its 2018 water allocation was not part of that project and instead part of an earlier project, and the limitations period for challenging the earlier project has run.  We agree with Los Angeles, so we will reverse the judgment.

## BACKGROUND

### I. 2020 Leases

The history of how Los Angeles secured the rights to water from Mono and Inyo Counties in the eastern Sierra Nevada mountains and exported it via aqueduct is well documented in prior decisions, and we need not repeat it here.  (See *County of Inyo v. City of Los Angeles* (1981) 124 Cal.App.3d 1, 3–4.)  We pick up the story in 2010, when Los Angeles approved a set of

substantively identical leases (2010 Leases) governing about 6,100 acres of land Los Angeles owns in Mono County. Los Angeles deemed the approval of the leases to be categorically exempt from CEQA review because they involved the use of existing structures or facilities with no or negligible expansion of use. (Los Angeles Guidelines for the Implementation of the California Environmental Quality Act of 1970, art. III, Class 1, ¶14; Cal. Code of Regs., tit. 14, § 15301.)[2]

The 2010 Leases include various provisions concerning water. In one section devoted to water supply, the leases state that they are "given upon and subject to the paramount rights of [Los Angeles] with respect to all water and water rights" and that Los Angeles reserves "all water and water rights . . . together with the right to develop, take, transport, control, regulate, and use all such water and water rights." The 2010 Leases further provide, "The availability of water for use in connection with the premises leased herein . . . is conditioned upon the quantity in supply at any given time. . . . The amount and availability of water, if any, shall at all times be determined solely by [Los Angeles]. The availability of water is further dependent upon

---

[2] Any citations to California Code of Regulations, title 14, sections 15000 to 15387 will be referred to and cited as "CEQA Guidelines." " 'The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' " (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128, fn. 7.)

3

[Los Angeles'] continued rights and ability to pump" groundwater.

In a separate subsection in the water supply section, the 2010 Leases state, "Lessee further acknowledges and agrees that pursuant to Section 220(3) of the City of Los Angeles City Charter, any supply of water to the leased premises by [Los Angeles] is subject to the paramount right of [Los Angeles] at any time to discontinue the same in whole or in part and to take or hold or distribute such water for the use of [Los Angeles] and its inhabitants.  Lessee further acknowledges and agrees that there shall be no claim upon [Los Angeles] whatsoever because of any exercise of the rights acknowledged under this subsection."

The 2010 Leases divide the leased acreage into irrigated and dry acre categories, with the lessees paying more for irrigated acres.  In the section devoted to irrigation water, the 2010 Leases state that "water supplies to all land classified for irrigation (alfalfa and pasture) will be delivered in an amount not to exceed five (5) acre-feet per acre per irrigation season, subject to conditions stated in" the preceding water supplies section.  The irrigation water section goes on to state, "The water supply for a specific lease is highly dependent upon water availability and weather conditions; due to this, delivery of irrigation water may be reduced in dry years."  The 2010 Leases allow for a readjustment of rent if Los Angeles makes a "dry finding," meaning a determination that it is necessary to reclassify the leased property by type or acreage.

4

The 2010 Leases make the lessees responsible for implementing certain land management plans Los Angeles developed pursuant to a memorandum of understanding between Los Angeles and various counterparties. That memorandum states, "While providing for the primary purpose for which Los Angeles owns the lands, including the protection of water resources utilized by the citizens of Los Angeles, the plans will also provide for the continuation of sustainable uses (including recreation, livestock grazing, agriculture, and other activities) [that] will promote biodiversity and a healthy ecosystem, and will consider the enhancement of Threatened and Endangered Species habitats."

The 2010 Leases' initial term ran from January 2009 to the end of 2013, but the leases allow the lessees to hold over as tenants at will after the expiration of the initial term, and Los Angeles and the lessees have proceeded under the 2010 Leases in this holdover status since 2013.

Los Angeles' provision of irrigation water in each of the years governed by the 2010 Leases was as follows:

| Runoff Year | Runoff Percent of Normal | Acre-feet (AF)/acre |
|---|---|---|
| 2009–2010 | 79 | 4.3 |
| 2010–2011 | 104 | 4.3 |
| 2011–2012 | 142 | 5.4 |
| 2012–2013 | 58 | 2.2 |
| 2013–2014 | 55 | 2.4 |
| 2014–2015 | 53 | 1.5 |

| 2015–2016 | 48 | 0 |
|-----------|-----|-----|
| 2016–2017 | 82 | 0.7 |
| 2017–2018 | 202 | 5.0 |

In 2015 and 2016, when anticipated runoff was 48 percent and 82 percent of normal, respectively, Mono County sent letters to Los Angeles objecting to Los Angeles' stated intent to provide the lessees less than 5 AF/acre of irrigation water. Mono County asked Los Angeles to provide between 2 and 3 AF/acre of water, to avoid economic losses to the lessees and damage to the environment of Mono County, including a distinct bi-state population of greater sage grouse that lived in the area.

## II. Dry Leases Proposal and 2018 Water Allocation

At the beginning of March 2018, Los Angeles sent the lessees copies of a proposed new form of leases (Proposed Dry Leases). The Proposed Dry Leases were to be for a five-year period running from January 2018 to the end of 2022, renewable for up to three additional five-year periods. As to irrigation water, which the Proposed Dry Leases defined as water applied to increase forage production, the Proposed Dry Leases stated that Los Angeles "shall not furnish irrigation water to Lessee or the leased premises, and Lessee shall not use water supplied to the leased premises as irrigation water." The Proposed Dry Leases then stated that from time to time, based on Los Angeles' "operational needs," it might spread or instruct the lessees to spread excess water on the leased properties. The Proposed Dry Leases, like the 2010 Leases, stated that any water spreading

6

would be "subject to the paramount right of [Los Angeles] at any time to discontinue the same in whole or in part and to take or hold or distribute such water for the use of [Los Angeles] and its inhabitants. Lessee further acknowledges and agrees that there shall be no claim upon [Los Angeles] whatsoever because of any exercise of" such rights.

In the cover letter accompanying the Proposed Dry Leases, Los Angeles stated that the lessees would be invited to attend a meeting in the first half of March at which the lessees could comment and ask questions about the changes embodied in the Proposed Dry Leases. On April 12, 2018, Los Angeles sent letters to the lessees informing them that it was "performing an Environmental evaluation" of the Proposed Dry Leases and the 2010 Leases would be in holdover status until the evaluation was complete and the Proposed Dry Leases took effect. Los Angeles further stated that it would be spreading water on the leased properties based on its operational needs and would determine the amount of water available for spreading based on the latest snow surveys and anticipated runoff in the eastern Sierras.

On April 19, 2018, Mono County wrote to the mayor of Los Angeles asking for reassurance that the lessees would receive sufficient irrigation water that season, which would start on May 1, 2018. Mono County acknowledged that Los Angeles had relaxed its pressure on lessees to execute the Proposed Dry Leases until the environmental impacts were analyzed, but it raised economic and environmental concerns about the proposal, including concerns about the sage grouse.

7

The mayor responded with a letter on May 1, 2018, in which he stated, "Changing environmental circumstances, including the most recent five-year drought, [require] us to reevaluate our current water uses, including the water historically provided to eastern Sierra ranches.  Over the next six months, LADWP will analyze the potential environmental impacts of reducing water on leased ranch land in Mono County and will discuss the findings with you and the ranchers before any new lease language is proposed."  The letter continued, "In the interim, I have directed staff to inform you this week of the amount of water available for operational spreading to the lessees this year based on snowpack and anticipated runoff.  Staff has indicated that the amount of water provided will likely be similar to 2016, which was also based on snowpack conditions.  This determination will be made under the flexibility that the existing expired leases afford."

Also on May 1, 2018, LADWP sent the lessees an email stating that it had evaluated the snowpack and anticipated runoff, which was 78 percent of normal, and had determined that it would provide the lessees 4,200 AF of water that runoff year.  4,200 AF of water amounted to 0.71 AF/acre of land governed by the 2010 Leases.  LADWP said this amount was consistent with how much water it had provided two years earlier, when the runoff was 82 percent of normal.

Mono County followed up two days later with a letter in which it accused Los Angeles of planning to increase exports of

water by discontinuing water deliveries to Mono County ranches and habitat or reducing such deliveries to an unsustainable level.

In the summer of 2018, Los Angeles spread approximately 900 AF of water on land within the leased properties to support the population of the sage grouse, separate from the irrigation flows delivered to the lessees.

In August 2018, Mono County sent a letter to the mayor of Los Angeles reiterating that Los Angeles' decision to divert and export almost all of the irrigation water it had historically provided the lessees was affecting the lessees and the environment, including the sage grouse, without prior environmental review. A week later, Mono County notified Los Angeles that it intended to file a petition for writ of mandate alleging Los Angeles' decision to curtail or reduce water deliveries to the lessees in order to export additional water to Los Angeles failed to comply with CEQA. Mono County filed its lawsuit the next day. Simultaneously, Los Angeles issued a notice of preparation that it would prepare an environmental impact report for the Proposed Dry Leases. Mono County later filed a first amended petition in which the Sierra Club joined as a petitioner.

## III. Writ petition proceedings

During proceedings on Mono County's petition, the parties disagreed about whether there was a formal administrative record of proceedings, because they disagreed about whether Los Angeles' reduction of water was the implementation of a previously approved project or the approval of a new project. Los

9

Angeles ultimately stipulated that it would prepare and certify an administrative record but reserved the right to argue that Mono County was not challenging a project subject to CEQA.

After the trial court issued a tentative order granting Mono County's petition but before the hearing, Los Angeles filed a declaration by Eric Tillemans, a manager at LADWP (Tillemans Declaration). The Tillemans Declaration asserted that Los Angeles diverted approximately 6.6 AF/acre of water to the leased properties in 2019 and 3 AF/acre of water in 2020. At the hearing on the tentative order, the parties argued about whether the court should consider this declaration. The trial court continued the hearing to allow Mono County to present a response to the declaration. Mono County then filed a response, to which Los Angeles replied.

The trial court ultimately granted Mono County's writ petition. It ruled that Los Angeles committed to a project without CEQA review when it proposed a change in water use in the Proposed Dry Leases and then implemented that change in the 2018 water allocations. The trial court issued a writ of mandate directing that until Los Angeles complied with CEQA, it had to maintain the status quo and provide water to the lessees consistent with annual fluctuation and availability of runoff around a five-year historical baseline, which the writ calculated as approximately 3.2 AF/acre from 2016 to 2021. The trial court denied Los Angeles' attempt to augment the administrative record with the Tillemans Declaration, though it did consider

that declaration when it calculated the historical baseline for the purposes of its writ of mandate.

## DISCUSSION

### I. Extra-record evidence

Before turning to the merits of Mono County's CEQA arguments, we will first establish the record for those arguments by addressing Los Angeles' contention that the trial court erred in partially excluding the Tillemans Declaration. The trial court excluded the declaration "regarding the resolution of the case on the merits" because Los Angeles submitted it after briefing was complete and the court had issued a tentative decision. The court also ruled that the declaration's information about water allocations in 2019 and 2020 was irrelevant to the question of whether the 2018 water allocation was a change in water use policy that constituted a CEQA project. The trial court nonetheless considered the declaration "regarding the remedy" for the violation it found; the court used the figures in the declaration when it calculated the five-year average water allocation (subject to annual variation in anticipated runoff) that Los Angeles needed to maintain pending completion of CEQA review.

Los Angeles raises four arguments against the trial court's ruling. It argues (1) the additional evidence in the declaration was admissible because there was no administrative record, (2) the declaration was not untimely because the trial court's tentative order raised for the first time the notion that the 2018 allocation was a commitment to the water policy in the Proposed

11

Dry Leases, (3) evidence that Los Angeles provided substantial amounts of water in 2019 and 2020 was relevant to proving it did not commit to a policy of reducing water deliveries, and (4) the trial court could not exclude the evidence for the purposes of the merits while considering it for the remedy. Mono County supports the trial court's stated rationale and further argues that Los Angeles did not comply with various California Rules of Court and local rules when it filed the declaration. It also asserts that the declaration is inaccurate because it merely presents its conclusions about the amount of water per acre without disclosing the basis for those conclusions and one of the conclusions is mathematically flawed.

We agree with Los Angeles' first argument that the declaration is admissible as extra-record evidence. While extra-record evidence is largely inadmissible in administrative mandamus cases, such evidence is admissible "in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576.) This rule applies here. The 2018 allocation that Mono County challenges was not the product of a quasi-legislative decision by LADWP's board or a quasi-judicial adjudicatory decision issued after a required hearing. It was instead the product of a lower-level staff decision, so it qualifies as an informal or ministerial administrative action. Mono County's writ petition challenging the 2018 allocation is therefore a traditional mandamus action, governed by section 21168.5 and

12

Code of Civil Procedure section 1085. (*Id.* at pp. 566–567.) There is accordingly no bar under administrative law to the trial court's consideration of the Tillemans Declaration. (Cont.Ed. Bar, Practice under the California Environmental Quality Act (2022) § 23.56 [admission of evidence outside the record is usually necessary in cases where an agency determines an activity is not subject to CEQA or is exempt].)

Los Angeles is also correct that the declaration is relevant to Mono County's petition. Mono County's position is that the lower allocation of water in 2018 was the implementation of a new policy of curtailed or eliminated water, either on its own or as the beginning of the same policy embodied in the Proposed Dry Leases proposal. Evidence that Los Angeles allocated higher amounts of water after 2018, including an allocation greater than the 5 AF/acre to which Mono County contends the lessees are entitled, plainly has some "tendency in reason to prove or disprove" Mono County's allegation that Los Angeles implemented a low- or no-water policy in 2018. (Evid. Code, § 210.)

We nonetheless agree with the trial court and Mono County that the Tillemans Declaration was untimely. The first page of Mono County's brief in support of its writ petition asserted that the issue before the trial court was whether Los Angeles' 2018 decision to modify its land management practices by significantly reducing water deliveries was a project under CEQA. Mono County later stated explicitly that the 2018 allocation was an implementation of the same project as the Proposed Dry Leases.

13

Los Angeles had enough notice about the scope of Mono County's petition that it should have submitted the Tillemans Declaration with its opposition brief.

Had the trial court completely excluded the declaration, this would be the end of the matter and we would affirm the ruling. However, after excluding the declaration from its consideration of the merits of Mono County's petition, the trial court went on to consider it for the purposes of crafting a remedy. This was inconsistent and improper. The declaration could not be untimely and irrelevant to the question of whether Los Angeles departed from the status quo in 2018 but timely and relevant to defining the status quo that needed to be maintained. If the trial court believed Los Angeles had implemented a new low-water policy in 2018, it does not make sense to include water allocations under that policy when crafting an order designed to preserve the status quo that predated the policy.

The remedy for the trial court's error could be either to exclude the Tillemans Declaration for all purposes or admit it for all purposes. Because the trial court considered the declaration for some purposes, its timeliness concern cannot have been that significant. And by giving Mono County an opportunity to respond to the declaration, the trial court avoided any prejudice to Mono County from the untimely filing. Additionally, as noted above, we have concluded the declaration is relevant to the issues at hand. We will therefore consider the Tillemans Declaration when examining the merits of Mono County's arguments.

14

## II. CEQA Compliance

### A. *Legal Principles and Standard of Review*

"CEQA and its implementing administrative regulations (CEQA Guidelines) establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations. [Citation.] The first tier is jurisdictional, requiring that an agency conduct a preliminary review to determine whether an activity is subject to CEQA. [Citations.] An activity that is not a 'project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379–380, fn. omitted (*Muzzy Ranch*).)[3] "Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review. Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier." (*Union of Marijuana Patients, supra*, 7 Cal.5th at p. 1185.) Environmental review can consist of a negative declaration, a mitigated negative

---

[3] "Courts have often labeled the project decision 'jurisdictional' because it determines whether CEQA applies at all. [Citations.] The term is inapposite because an agency's jurisdiction over a proposed activity does not depend upon the application of CEQA. Nonetheless, its use conveys the preliminary nature of the project determination." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186, fn. 4 (*Union of Marijuana Patients*).

15

declaration, or an environmental impact report (EIR). (*Id.* at pp. 1186–1187.)

Appellate review in a CEQA case is "de novo in the sense that we review the agency's actions as opposed to the trial court's decision." (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 849.) "The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. Section 21168.5 states in part: 'In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] [The Supreme Court's] decisions have thus articulated a procedural issues/factual issues dichotomy. '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)

## B. 2018 Water Allocation

The parties frame their arguments on the merits in this case in several different ways, but most of their arguments,

including the one we find dispositive, center on the core question of whether the 2018 water allocation is part of the 2010 Leases project or a new reduced water project, either on its own or as part of the Proposed Dry Leases. We therefore begin with that issue.

"Whether an activity is a project is an issue of law that can be decided on undisputed data in the record on appeal." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382.) As relevant here, CEQA defines a project as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.)

The CEQA Guidelines expand on this and define a project as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] (1) An activity directly undertaken by any public agency . . . . [¶] (2) An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (3) An

17

activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  (CEQA Guidelines, § 15378, subd. (a).)  The CEQA Guidelines further state, "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.  The term 'project' does not mean each separate governmental approval."  (CEQA Guidelines, § 15378, subd. (c).)

There are thus three separate strands to these definitions: agency involvement, physical change to the environment, and whole of an action including multiple discretionary approvals. There is no dispute about Los Angeles' involvement in the 2018 water allocation or whether that allocation is the type of activity that might cause a physical change in the environment.  Even if there were, we would easily find those conditions satisfied here. LADWP either directly or indirectly controlled the application of irrigation water to the leased properties, and a change in irrigation policy would reasonably be expected to affect the physical environment.  The focus of our inquiry is therefore on whether the 2018 water allocation is the whole of an action or part of a larger action, either the 2010 Leases or the Proposed Dry Leases.

We conclude the allocation is part of the 2010 Leases.  The 2018 water allocation was not a one-off action by Los Angeles.  It came after years of such actions and, because the 2010 Leases were in holdover status, an ongoing leasehold relationship governed it.  It would make sense to view the 2018 water

18

allocation as a project of its own or as part of the Proposed Dry Leases only if it were a departure from the terms of the 2010 Leases or, perhaps, Los Angeles' practice of delivering water under those leases. A close examination of the 2010 Leases, the history of water allocations under them, and Los Angeles' deliveries after 2018 demonstrates that the 2018 allocation was not a turning point towards a low-water policy or the Proposed Dry Leases, but rather the latest in a string of discretionary water allocations that the 2010 Leases allowed Los Angeles to make.

## 1. Terms of 2010 Leases

The 2010 Leases state that water supplied to land classified for irrigation "will be delivered in an amount not to exceed five (5) acre-feet per irrigation season" and that this water is "highly dependent upon water availability and weather conditions" such that "delivery of irrigation water may be reduced in dry years." The leases also state that water availability "is conditioned upon the quantity in supply at any given time," but that "[t]he amount and availability of water, if any, shall at all times be determined solely by" Los Angeles. Another provision allows Los Angeles to make a "dry finding" and reclassify a lessee's land as not subject to irrigation based on "the availability of water," in which case the rent owed by the lessee will be reduced. The 2010 Leases obligate the lessees to carry out certain land management plans that are intended to continue sustainable uses such as livestock grazing and agriculture.

19

Mono County contends that these provisions demonstrate that the lessees had reasonable expectations that the 2010 Leases obligated Los Angeles to continue to deliver water for sustainable grazing uses and did not allow it to curtail water deliveries for the purposes of increasing water deliveries to Los Angeles' residents.  If these provisions were the only aspects of the 2010 Leases that addressed water supplies, we might agree.  However, the 2010 Leases begin the discussion of water supplies by stating, "It is understood and agreed to by Lessee that this lease is given upon and subject to the paramount rights of [Los Angeles] with respect to all water and water rights . . . ."  Most significantly, the 2010 Leases further state, "Lessee further acknowledges and agrees that pursuant to Section 220(3) of the City of Los Angeles City Charter, any supply of water to the leased premises by [Los Angeles] is subject to the paramount right of [Los Angeles] at any time to discontinue the same in whole or in part and to take or hold or distribute such water for the use of [Los Angeles] and its inhabitants.  Lessee further acknowledges and agrees that there shall be no claim upon [Los Angeles] whatsoever because of any exercise of the rights acknowledged under this subsection."[4]

---

[4] Neither Los Angeles nor Mono County quotes or explains what section 220(3) of the Los Angeles City Charter says about water.  Our research suggests that the 2010 Leases' citation to section 220(3) referred to the charter in effect prior to 2000, when the voters of Los Angeles adopted a new charter.  (*Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 971.)  Section 677 of the current charter appears to contain the content of section 220(3) of the former charter, and it empowers the board of

The plain language of the last provision accords Los Angeles the right to do precisely what Mono County contends it did: curtail water deliveries for the purposes of increasing water deliveries to Los Angeles' residents. Mono County resists this conclusion by characterizing this provision as a contingent reservation of a future right and arguing that if the 2010 Leases allowed Los Angeles to reduce irrigation water in favor of water deliveries to the city, Los Angeles would have prepared an EIR when it approved the leases instead of declaring the project exempt as involving unchanged use of existing facilities. Mono County is right that the provision is a reservation of a right for Los Angeles to exercise in the future. But nothing prevents Los Angeles from exercising the right when it wants to, so it must be considered a part of the 2010 Leases project. Mono County's speculation that Los Angeles would have prepared an EIR if it believed it was obtaining in the 2010 Leases a right to curtail water deliveries is just that—speculation.[5]

---

LADWP to distribute surplus water not required by consumers within the city limits, "subject to the paramount right of the City, at any time, to discontinue the contract, in whole or in part, and to take, hold and distribute, the surplus water for the use of the City and its inhabitants." (L.A. City Charter, § 677(a)(2)(A).)

[5] The lessees are not parties to this proceeding, and our interpretation of the terms of the 2010 Leases for the purposes of identifying the relevant CEQA project is without prejudice to any breach of contract claims they might raise against Los Angeles. We reject Los Angeles' argument, raised for the first time in its reply brief, that the lessees are indispensable parties and that Mono County's failure to join them requires dismissal.

The reservation of rights provision might suggest that Los Angeles could permanently end the delivery of irrigation water under the 2010 Leases, thereby effectively implementing a zero-water policy under those leases without needing to perform any additional environmental review.  Mono County argues that Los Angeles' choice to undertake environmental review for the Proposed Dry Leases shows that the 2010 Leases do not give it this power, because otherwise it would not have needed to start a new project.  We need not decide whether the reservation of rights can be stretched so far as to allow Los Angeles to end all water deliveries under the 2010 Leases.  Los Angeles concedes that a policy of not providing any irrigation water to the leased properties is a markedly different project than the 2010 Leases.  We accept this concession and therefore conclude the 2010 Leases project includes the provision of irrigation water subject to changing water availability and Los Angeles' right to reduce water allocations to free up water for its own purposes, so long as such reductions do not de facto convert the 2010 Leases into dry leases.  Such an interpretation reconciles the reservation of rights with the numerous provisions tying the supply of irrigation water to the availability of water.

Mono County also argues that *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310 (*Communities*) governs here and dictates that a grant of discretion in the 2010 Leases cannot excuse Los Angeles from complying with CEQA.  In that case, an oil company had permits to operate boilers at certain maximum levels, though it

normally did not run the boilers at the maximum levels. (*Id.* at pp. 317, 322.) The Supreme Court held that the evaluation of the environmental effects of a new project proposal to create diesel fuel that included increased operation of the existing boilers had to account for the increased emissions from the boilers. (*Id.* at pp. 316–318, 322.) Although the company already could increase the use of the boilers under its existing permits, the maximum allowed by those permits did not establish the baseline for the new project's additional effects. (*Id.* at p. 322.) That baseline was determined by the refinery's actual operations, not hypothetical maximums. (*Ibid.*)

The Supreme Court said its holding did not violate the company's vested rights to operate the boilers at the permitted levels because it was considering a new project proposal and the company's "right to operate the boilers at any particular level [was] not itself at issue." (*Communities*, *supra*, 48 Cal.4th at p. 323.) It explained that CEQA analysis of the proposed project "could not result in an order that [the company] reduce or limit its use of an individual boiler below the previously permitted level." (*Ibid.*) The Court rejected a statute of limitations argument for the same reason, reiterating that "CEQA analysis of the Diesel Project does not constitute review of the [government agency's] long-final decisions to issue the boiler permits." (*Id.* at p. 325.)

Applied here, *Communities* establishes that Los Angeles' analysis of the environmental impacts of the zero-water policy in the Proposed Dry Leases must be measured against the baseline

23

of the amounts of irrigation water Los Angeles has actually provided the lessees, not its hypothetical right to eliminate water deliveries in any given year. But this does not help Mono County, because *Communities* also establishes that the need for CEQA analysis of the Proposed Dry Leases project does not prevent Los Angeles from exercising its rights under the 2010 Leases to curtail or reduce water deliveries in any given year.

## 2. Historical practice

The parties' practice under the 2010 Leases is consistent with our interpretation of the terms of the 2010 Leases. Mono County contends that Los Angeles historically provided up to 5 AF/acre of water to the leased properties, reduced proportionally in any given year based on deviations in snowpack and anticipated runoff from the historical average. But the record of Los Angeles' water deliveries under the 2010 Leases is not consistent with this account. In 2010, a year with runoff of 104 percent of average, Los Angeles provided 4.3 AF/acre of water, which is 86 percent of the 5 AF/acre maximum set in the 2010 Leases. In 2011, when there was 142 percent of normal runoff, Los Angeles provided 5.4 AF/acre, which is more than the 5 AF/acre maximum set in the leases. In 2012, a year in which runoff was 58 percent of normal, under Mono County's theory Los Angeles would have provided 2.9 AF/acre. The lessees instead received 2.2 AF/acre, which is 44 percent of a 5 AF/acre allocation. In 2013, runoff was 55 percent of normal and the lessees received 2.4 AF/acre, which is 48 percent of the 5 AF/acre, close to what Mono County's theory would predict. But in 2014,

24

runoff was similar at 53 percent of normal, and the lessees received only 30 percent of the 5 AF/acre, or 1.5 AF/acre. In 2015, runoff was 48 percent of normal, and the lessees received no water at all. In 2016, runoff was 82 percent of normal, and the lessees received 0.7 AF/acre, which represents 14 percent of 5 AF/acre. In 2017, runoff was 202 percent of normal and the lessees received 5 AF/acre, as Mono County's theory would predict.

The figures present an overall picture of water deliveries that correlate only loosely with annual runoff and have a high minimum threshold of runoff before Los Angeles will deliver water. This is not consistent with Mono County's argument that water deliveries have a 5 AF/Acre maximum that is reduced proportionally when runoff is below average. In particular, Los Angeles' provision of 30 percent of the 5 AF/acre in 2014, no water in 2015, and 14 percent of the 5 AF/acre in 2016, despite rainfall in those years being much higher, demonstrate that water deliveries under the 2010 Leases do not have a linear relationship with runoff. The 2016 figures are especially striking because the runoff that year was comparable to the runoff in 2018 (82 percent of normal in 2016 and 78 percent in 2018), and the amount of water provided was essentially identical, 0.7 AF/acre in 2016 and 0.71 AF/acre in 2018. These 2016 figures show that Los Angeles' 2018 water allocation was consistent with historical practice, not an aberration indicative of a new water policy.

Mono County discounts the significance of the 2015 and 2016 figures, asserting that 2015 was the peak of a drought, 2016 was the first year of recovery, and in both years the lessees agreed to lower water allocations. The pages of the record that Mono County cites to support its assertion that the lessees acquiesced to reduced deliveries in those years do not support its assertion. Moreover, the record shows that in both 2015 and 2016, Mono County wrote to Los Angeles to complain about the reduced deliveries, suggesting that the lessees objected to the water allocations in those years.

More broadly, Mono County's attempt to explain away the 2015 and 2016 water allocations as the product of extenuating circumstances serves only to show that water deliveries under the 2010 Leases depend on more than just rainfall and anticipated runoff in any given year. If Los Angeles had the right to reduce deliveries in 2015 and 2016 to take into account prior shortfalls or other criteria, as Mono County contends, its allocation of 0.71 AF/acre in 2018, a year of below average rainfall, does not seem remarkable. While runoff in 2017 was well above average, after the five-year severe drought that lasted from 2012 to 2017 Los Angeles could have reasonably decided to reduce the allocation in 2018 in response to a below average runoff year, perhaps to conserve water resources in case the drought returned.

## 3. Subsequent allocations

Los Angeles' practice under the 2010 Leases after 2018 confirms that the 2018 water allocation was not a radical

departure from previous practice.  According to the Tillemans Declaration, in 2019 Los Angeles diverted approximately 6.6 AF/acre of water to the leased properties, and in 2020 it diverted 3 AF/acre of water.  Mono County contends the Tillemans Declaration omits the amount of runoff in those years and incorrectly calculates the amount of water Los Angeles provided in 2019, with the correct number being 6.2 AF/acre.  These are valid criticisms, but they do not change the fact that Los Angeles provided substantial quantities of water in 2019 and 2020.  There is no need to know the amount of runoff to see that the 2019 and 2020 allocations are significantly higher than the 2018 level.  This evidence refutes Mono County's argument that the 2018 water allocation represented the beginning of a new low- or zero-water delivery policy.

Mono County compares Los Angeles' actions here with the facts in *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795 (*Yorty*), which dealt with an earlier dispute surrounding Los Angeles' actions in exporting water from the Owens Valley to Los Angeles.  There, Inyo County contended that Los Angeles' program of increased groundwater pumping from the Owens Valley constituted a project under CEQA and Los Angeles needed to prepare an EIR before approving the project.  (*Id.* at pp. 800–802.)  Los Angeles contended the increased pumping was part of the same project as the aqueduct by which the pumped groundwater was transported.  (*Id.* at p. 805.)  Because the aqueduct was built and used before the advent of CEQA, Los Angeles argued the pumping was exempt from CEQA.  (*Ibid.*)

The Court of Appeal held that the aqueduct project was separate from Los Angeles' increased pumping of groundwater, in part because the aqueduct had been used to transport surface water in the past while pumped groundwater was becoming a larger portion of the water in the aqueduct. (*Id.* at p. 806.) The court also noted that Los Angeles had completed the aqueduct before CEQA took effect but had only spent about half of the money for the groundwater pumping at that point, indicating that the groundwater pumping project, unlike the aqueduct, was being completed after CEQA. (*Id.* at pp. 806–807.)

Mono County argues that Los Angeles' cutbacks in irrigation water and augmented exports of water are similar to its increase in groundwater pumping and reduced water deliveries in *Yorty*, so the 2018 allocation is a separate project from the 2010 Leases. The comparison does not hold. First, *Yorty* did not involve anything like the 2010 Leases. By granting Los Angeles the authority to reduce water allocations to the lessees in future years, the Leases—not Los Angeles' historical record of water deliveries—set the parameters of the project under CEQA. Second, the historical record of water allocations under the 2010 Leases, and in particular the low allocations in 2014, 2015, and 2016 and higher allocations in 2019 and 2020, demonstrate that the 2018 water allocation was, for CEQA purposes, an implementation of the 2010 Leases, not a new project severable from the 2010 Leases. Finally, as Los Angeles pointed out in the trial court and in its briefs here, there is no evidence in the record that Los Angeles increased its exports of

28

Mono County water to Los Angeles residents in 2018 or afterwards.

In a variation on its *Yorty* argument, Mono County contends that the 2018 water allocation was a significant change from the 2010 Leases that triggered the need for an initial environmental review as a new project. This argument relies on Mono County's assertions that in 2018 Los Angeles provided less water than it had historically, increased water exports, and directly spread a portion of the 2018 water allocation itself, purportedly to preserve habitat for the sage grouse. We have already rejected the first two assertions as factually unsupported. The third does not sway us. Even if Los Angeles' choice in 2018 to directly spread a small amount of water on the leased properties (rather than having the lessees spread it) could be viewed as a deviation from prior practice under the 2010 Leases, that change is minor and insignificant. This is especially true given that the change was designed to mitigate environmental harm and that there is no evidence it increased environmental impacts in any way.

### 4. Proposed Dry Leases

Besides arguing that the 2018 water allocation was a departure from the past practice under the 2010 Leases, Mono County also argues the allocation constituted Los Angeles' improper implementation of the project embodied in the Proposed Dry Leases, before the requisite CEQA review. This argument relies on the timing of Los Angeles issuing the Proposed Dry Leases, Mono County and the lessees objecting to the Proposed

29

Dry Leases on CEQA and other grounds, Los Angeles issuing the 2018 water allocation in a smaller amount than the lessees expected, and Los Angeles then filing a notice of preparation of an EIR for the Proposed Dry Leases project. Mono County cites several communications that discuss both the 2018 water allocation and the Proposed Dry Leases, including the May 1, 2018, letter from the Los Angeles mayor, as evidence of the connection between the 2018 allocation and the Proposed Dry Leases. The trial court relied on this evidence to find the 2018 water allocation constituted part of the same project as the Proposed Dry Leases.

Contrary to Mono County's argument, the sequence of events supports our conclusion that the 2018 water allocation was within the scope of the 2010 Leases. The timing is consistent with Los Angeles' explanation that it issued the Proposed Dry Leases, agreed to complete the requisite environmental review for those Leases, and committed to maintaining its allocation practice under the 2010 Leases while proceeding with the environmental review. We have concluded that the 2018 water allocation was within Los Angeles' authority under the 2010 Leases and consistent with its water allocation practice both before and after 2018; as a result, Mono County cannot sustain its burden of establishing that Los Angeles prejudicially abused its discretion in determining that the 2018 water allocation was within the scope of the 2010 Leases project and not subject to additional environmental review. (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th

936, 944.)  It is also not surprising that Los Angeles' communications discussed both the 2010 Leases and the Proposed Dry Leases, given that Los Angeles needed to explain that it was continuing under the 2010 Leases when it announced the environmental review of the Proposed Dry Leases project.

Admittedly, the timing of the 2018 water allocation, viewed in isolation, could also support Mono County's opposing inference that Los Angeles intended to use a lower annual water allocation under the 2010 Leases to implement the new water policy that it had proposed in the form of the new dry leases.  Given the contentious history of Los Angeles' acquisition of water rights in Mono and Inyo Counties, Mono County's suspicions in this regard are understandable.  (See Reisner, Cadillac Desert (1986) pp. 64–73; Dufurrena, *Give Me a Stone* (Winter 2018–2019) Range Magazine, at p. 23.)  However, we find this inference implausible.  The Tillemans Declaration directly contradicts this view of the timing of Los Angeles' actions, since the water allocations in 2019 and 2020 show that Los Angeles has not implemented a low- or zero-water policy.

The notice of preparation that Los Angeles issued in which it stated it was undertaking environmental review for the Proposed Dry Leases may constitute an admission that the dry leases are a new project, as Mono County argues.  But the notice of preparation does not mean Los Angeles' claimed reliance on the 2010 Leases for the 2018 allocation was a pretext for implementing that new project.  Mono County's theory also makes little sense.  If 2018 marked the beginning of a practice of

sharply reduced water deliveries to the lessees (disregarding for the moment the Tillemans Declaration's evidence of increased allocations in 2019 and 2020), the correlation between the shift and the Dry Leases Proposal would be obvious and Los Angeles' claim to be relying on the 2010 Leases would be unmistakably pretextual. Without some evidence beyond the timing sequence to support the notion that the 2018 allocation was a subterfuge of some sort, we do not subscribe to Mono County's view that Los Angeles deceived the public and the courts by falsely claiming the 2018 water allocation was separate from the Proposed Dry Leases. (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"]; *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency* (2009) 179 Cal.App.4th 101, 108 ["It is well established that . . . '[a]ll presumptions of law are in favor of the good faith of public officials' "].)

### C. Statute of limitations

Our determination that the 2018 water allocation was part of the 2010 Leases project and not a project in its own right or an implementation of the Proposed Dry Leases makes the disposition of Mono County's petition straightforward. Our analysis at this point could take several different paths. (See *Save Tara v. City of West Hollywood*, *supra*, 45 Cal.4th at pp. 129, fn. 8, 131 [recognizing that a CEQA dispute over an activity could be viewed as a question of whether the activity was a project or a timing question of when the agency approved it].)

The simplest route out of the thicket of the parties' arguments involves the statute of limitations.

"To ensure finality and predictability in public land use planning decisions, statutes of limitations governing challenges to such decisions are typically short.  [Citations.]  The limitations periods set forth in CEQA adhere to this pattern; indeed, as the CEQA Guidelines themselves assert, 'CEQA provides *unusually short* statutes of limitations on filing court challenges to the approval of projects under the act.'  (CEQA Guidelines, § 15112, subd. (a), italics added.)"  (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499.)  The longest limitations period applicable to a CEQA claim is 180 days from project approval or, if there was no formal approval, 180 days from the commencement of construction.  (*Id.* at pp. 500–501.)  If a party does not file a court action challenging a project within this period, such a challenge is barred.  (*Id.* at p. 499, citing CEQA Guidelines § 15112, subd. (b).)

Los Angeles approved the 2010 Leases in early 2010.  Mono County's writ petition challenging the 2018 implementation of that project, which Mono County filed in August 2018, is therefore time-barred.  The fact that the 2018 water allocation was a subsequent discretionary decision or approval of an activity under the 2010 Leases does not remove it from the ambit of the 2010 Leases project, so the 2018 allocation did not restart the limitations period.  (*Van de Kamps Coalition v. Board of Trustees of Los Angeles Community College Dist.* (2012) 206 Cal.App.4th 1036, 1047–1048.)  "The limitations period starts running on the

33

date the project is approved by the public agency and is not retriggered on each subsequent date that the public agency takes some action toward implementing the project." (*Id.* at p. 1045.) This rule is based on the definition of a CEQA project as being the "whole of an action," not "each separate governmental approval" taken to implement the project. (CEQA Guidelines § 15378, subds. (a), (c); *Van de Kamps*, at p. 1045.) It makes no difference that Los Angeles approved the 2010 Leases under an exemption. (*City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1717, 1720–1721 [authorization of award of renewed service contract to operate hazardous waste facility and simultaneous notice of exemption started the statute of limitations, not later execution of materially identical contract].)

If Mono County believed that a decision to reduce the lessees' water allocation in a specific year would be a substantial change in practice and have significant effects on the environment, it should have raised that argument when Los Angeles approved the 2010 Leases that gave it the authority to make such reductions. Los Angeles could then have considered the argument that it was departing from its prior policy and evaluated any environmental impacts and feasible mitigation measures. At a minimum, even if Los Angeles' approval of the 2010 Leases and its reservation of water rights did not give Mono County notice that Los Angeles claimed the authority under the leases to eliminate water deliveries in any given year, Los Angeles' exercise of that authority in 2014, 2015, and 2016 surely did provide such notice. Mono County should have filed a CEQA

34

petition at that time, when it complained of the environmental effects of such a decision in letters to Los Angeles.

## DISPOSITION

The trial court's judgment is reversed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
DESAUTELS, J.*

*County of Mono et al. v. City of Los Angeles et al.*  (A162590)

---

\* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/26/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COUNTY OF MONO et al., | |
|     Plaintiffs and Respondents, | A162590 |
| v. | |
| CITY OF LOS ANGELES et al., | (Alameda County Super. Ct. No. RG18923377) |
|     Defendants and Appellants; | |
| DEPARTMENT OF FISH AND WILDLIFE, | |
|     Real Party in Interest. | |

THE COURT:

The opinion in the above-entitled matter filed on June 30, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Date: July 26, 2022                                    POLLAK, P. J.

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Evelio M. Grillo

Counsel: Myers Nave, Amrit S. Kulkarni, Julia L. Bond, Edward Grutzmacher; Michael N. Feuer, City Attorney, Julie C. Riley, Assistant City Attorney, David Edwards, Deputy City Attorney; Joseph A. Brajevich for Defendants and Appellants.

Law Office of Donald B. Mooney, Donald B. Mooney; Stacey Simon, County Counsel; Laurens Silver for Plaintiffs and Respondents.

Nhu Nguyen, Adam L. Levitan, Deputy Attorneys General, for Real Party in Interest.